UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JOSEPH STEFANOVICH,

                              Petitioner,

         v.                                                              9:23-CV-0934
                                                                        (ECC)
J. WOLCOTT,

                              Respondent.

_____

APPEARANCES:                                          OF COUNSEL:

JOSEPH STEFANOVICH
Petitioner Pro Se
14-B-0623
Attica Correctional Facility
Box 149
Attica, NY 14011

HON. LETITIA JAMES                                    DANIEL P. HUGHES, ESQ.,
Attorney for Respondent                               MARGARET A . CIEPRISZ, ESQ.
New York State Attorney General                           Ass't Attorneys General
The Capitol
Albany, New York 12224

ELIZABETH C. COOMBE
United States District Judge

**DECISION and ORDER**

## I.    INTRODUCTION

Petitioner Joseph Stefanovich ("petitioner"), who is serving a determinate prison term

of twenty years followed by five-years post-release supervision after conviction for first

degree rape, seeks federal habeas relief pursuant to 28 U.S.C. § 2254.  Dkt. No. 1, Petition

1

("Pet.").[1]  Respondent opposed the petition and filed the state court record ("SCR"), along with multiple reporters transcripts ("RT") from the trials and proceedings below.  Dkt. No. 16, Opposition ("Oppos."); SCR, Dkt. Nos. 18-1 to 18-9; Dkt Nos. 19-1 to 19-4 (RT from 2013 *Huntley* hearing prior to first trial, 2016 *Singer* hearing prior to retrial, additional 2016 pretrial hearings and arguments prior to retrial, 2016 waiver of jury trial, January 2017 bench trial (retrial), and January 2017 sentencing).[2]  Petitioner filed a reply.  Dkt. No. 22, Reply.

On May 21, 2026, the Court noted that petitioner had raised what appeared to be an unexhausted ineffective assistance of counsel claim, which respondent acknowledged in its opposition.  Dkt. No. 26, May 2026 text order; *see also* Pet. at 37; Oppos. at 31.  The Court ordered respondent to supplement the record regarding the existence of any state court collateral post-conviction proceedings, which it did on June 4, 2026, as discussed in more detail below.

For the following reasons, the petition is denied and dismissed.

## II.     RELEVANT BACKGROUND

Given the lengthy history of this case, the Court sets forth below a brief summary of the procedural history, providing more detail in the sections that follow.

On May 29, 2013, an Oswego County grand jury indicted petitioner with rape in the first degree, New York Penal Law § 130.35(1), based on events that took place on July

---

[1]  The Court notes that citations to the State Court Record ("SCR"), Dkt. Nos. 18-1 through 18-9, refer to the Bates stamp at the bottom-center of each page, as each exhibit is separately and consecutively paginated.  As for other filed documents, for the sake of clarity, with limited exceptions, citations refer to the pagination generated by CM/ECF, the Court's electronic filing system.  This includes citations to the state courts' reporters transcripts from hearings and trials ("RT") as submitted by respondent.  *See* Dkt. Nos 19-1 through 19-4; Dkt. No. 25 (Index to RT).

[2] Upon the Court's request, respondent filed an index to the voluminous RT, located at Dkt. No. 25.

30, 2005, in the Village of Phoenix, New York, involving victim, J.S.  SCR 148.  On February 21, 2014, petitioner was convicted on the rape count following a five-day jury trial, which began in November 2013.  *Id.* at 138.  The Oswego County Court sentenced petitioner the next day to twenty years determinate incarceration and five years post-release supervision.  *Id.* at 689.

Petitioner appealed to the New York State Appellate Division, Fourth Department ("Appellate Division"), which, on February 11, 2016, reversed his conviction due to ineffective assistance of counsel—namely, petitioner's first trial counsel's references to petitioner's status as a registered sex offender.  *Id.* at 717-20.  The Appellate Division ordered a new trial, and after petitioner waived his jury trial rights, a bench trial was held before Judge James W. McCarthy of the Oswego County Supreme Court ("second trial court" or "retrial court") from January 3, 2017, through January 6, 2017.  RT at 19.  On January 6, 2017, Judge McCarthy found petitioner guilty of rape in the first degree, RT 575, and sentenced him to the same sentence as the first trial court:  twenty-years determinate incarceration and five-years post-release supervision.  SCR 48.

On January 27, 2017, petitioner appealed the second trial court's conviction and his sentence to the New York State Appellate Division, Fourth Department (second direct appeal).  The Appellate Division affirmed, and petitioner thereafter filed a counseled application for leave to appeal to the New York Court of Appeals ("Court of Appeals").  SCR 579-96.  On September 29, 2022, the Court of Appeals denied leave to appeal.  *Id.* at 607. This action followed.

### A.    July 2005 Rape and Pre-Indictment Investigation

As noted by the Appellate Division on petitioner's first appeal: [3]

On the evening of July 30, 2005, the victim reported to the police in the Village of Phoenix that a young man whom she did not know dragged her into the woods and raped her. She had injuries consistent with a violent assault, and semen from the victim's vagina was recovered at the hospital by use of a rape kit.  In [September 2006], . . ., the [Village of Phoenix] police learned that the DNA from the semen matched [petitioner's] DNA profile, which was in the Combined DNA Index System (CODIS) because he was a convicted felon.[4] When a police investigator interviewed [petitioner] two years later in December 2012, [petitioner] said that he did not know or recognize the victim and never had sexual intercourse with her. [Petitioner] agreed to give an oral swab, providing the police with his DNA, and subsequent testing conclusively established that [petitioner's] DNA matched that from the semen preserved in the rape kit. [Petitioner] was arrested on January 31, 2013[,] and charged with rape in the first degree.

SCR 717 (*People v. Stefanovich*, 136 A.D.3d 1375, 1375–76 (4th Dep't 2016)).

### B.    2013-2014 Pretrial Proceedings

On June 21, 2013, petitioner filed an omnibus pretrial motion on which the trial court held a July 25, 2013 motion hearing and an August 2, 2013 evidentiary hearing. [5]  SCR 608. Among other motions, petitioner's June 2013 omnibus motion included a motion to suppress petitioner's statements to law enforcement, a motion to dismiss the indictment based on legal

---

[3] When a federal court reviews the merits of a habeas petition, the "factual findings of the New York Courts are presumed to be correct."  *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (internal quotation marks and citation omitted); *see also Dean v. Noeth*, No. 18-CV-6648 CJS, 2022 WL 2974034, at *9 (W.D.N.Y. July 27, 2022).

[4] At the time of petitioner's first direct appeal, the courts were under the mistaken belief that the DNA match occurred in 2010.  *See* SCR 717.  In actuality, as described in more detail below, the first DNA match occurred in September 2006.  *See id.* at 456.

[5] The evidentiary hearing transcripts are located at Dkt. No. 19-1, at 2-42.  Respondent did not include the July 2013 motion hearing transcripts in the SCR before this Court.

insufficiency, and a motion for a *Sandoval/Ventimiglia* hearing to exclude evidence of petitioner's sex offender registry status.[6] *See id.* at 608-17 (trial court's August 28, 2013 order on motions).

### 1. Petitioner's Motion to Suppress December 2012 Statements to Law Enforcement/*Huntley* Hearing[7]

On August 2, 2013, the first trial court held an evidentiary hearing on petitioner's motion to suppress, at which Oswego Country Investigator Carmen Rojek was the sole witness. *Id.* at 611; RT, at 2-42. In its subsequent August 28, 2013 order, the trial court recounted the facts associated with Investigator Rojek's December 2012 interview with

---

[6]As explained by another federal habeas court,

> *Sandoval*, *Molineux*, and *Ventimiglia* each refer to the names of New York Court of Appeals cases, and discussion of *"Sandoval/Molineux/Ventimiglia* rulings" is "a short-hand reference to the New York procedure for determining in advance whether evidence of prior crimes is admissible for impeachment purposes in the event the defendant testifies (*Sandoval*), or prior crimes/uncharged criminal conduct is probative for the purpose of showing, e.g., (1) motive, (2) intent, (3) absence of mistake or accident, (4) common scheme or plan, or (5) identity, and whether that probative value outweighs the prejudicial effect (*Ventimiglia/Molineux*)." *Brown v. Walsh*, No. 9:06-cv-01130-JKS, 2009 WL 3165712, at *1 n.4 (N.D.N.Y. Sept. 28, 2009) (citing *People v. Sandoval*, 34 N.Y.2d 371 (1974); *People v. Ventimiglia*, 52 N.Y.2d 350 (1981); *People v. Molineux*, 168 N.Y. 264 (1901)). *Molineux* and *Ventimiglia* are often used interchangeably to describe pre-trial hearings held to determine the admissibility of prior crimes or bad acts evidence. *See Liggins v. Burge*, 689 F. Supp. 2d 640, 644 n.2 (S.D.N.Y. 2010) ("*New York v. Molineux* permits a defendant's prior criminal and bad acts to be admitted as direct evidence in the prosecution's case under certain circumstances. . . . Hearings addressing the admission of such evidence are alternatively referred to as *Ventimiglia* hearings.") (citation omitted).

*Olivo v. Graham*, 2021 WL 3272080, at *2 n.4 (S.D.N.Y. Mar. 23, 2021), *report and recommendation adopted*, 2021 WL 3271833 (S.D.N.Y. July 30, 2021)

[7] In New York, a *Huntley* hearing determines the voluntariness of inculpatory statements made by a criminal defendant to law enforcement officers. *See People v. Huntley*, 15 N.Y.2d 72 (1965).

petitioner,[8] finding the relevant facts as follows:

> On December 19, 2012, Investigator Rojek spoke to [petitioner] at Dewitt Town Court. At the time, [petitioner] was a suspect in an investigation of an alleged rape. [Petitioner] was scheduled to appear in Dewitt Town Court that day on a traffic violation. No details of Investigator Rojek's initial conversation with [petitioner] inside a hallway of the building were elicited at the hearing.
>
> [Petitioner] and Investigator Rojek [then] entered an interview room of the Dewitt Police Department, which is located in the same building as Dewitt Town Court. [Petitioner] was not handcuffed. The interview room was equipped with an audio/visual recording device. Additionally, Investigator Rojek activated a digital audio recorder to record his conversation with [petitioner]. The door to the interview room was closed.
>
> Investigator Rojek read [petitioner] *Miranda* warnings from a blank statement form. . . . Investigator Rojek informed [petitioner] that he was not under arrest and was free to leave at any time. [Petitioner] stated that he understood. [9]

SCR 611-12.

> During the conversation that followed,
>
> Investigator Rojek informed [petitioner] that he was working on a case that allegedly occurred in 2005 in the Village of Phoenix. Investigator Rojek asked [petitioner] if he knew the alleged victim. [Petitioner] stated no. Investigator Rojek

---

[8] The interview was recorded, but it does not appear that the CD was ever officially transcribed. *See* SCR 151 (noting that "CD of Audio Recording" of interview was to be forwarded "under separate cover" to the Appellate Division). There is, however, what appears to be an unofficial transcript from the interview included in this Court's habeas record. *See id.* at 177-79.

The Court further notes that petitioner's motion also sought to suppress the introduction of statements that he made on January 31, 2013, when he was in custody and had previously invoked his right to counsel. SCR 615. The prosecution conceded that it would not admit the January 2013 statements; thus, those statements were not at issue at the motion to suppress hearing. *Id.* The trial court subsequently stated that it was granting petitioner's motion as to the January 31, 2013 statements because the prosecution could not establish that they were voluntarily made. *Id.* at 615-16.

[9] Respondent did not include the parties' motion papers before the first trial court in this Court's record; thus, the Court has relied on the trial court's order and the record transcripts for the relevant background. *See* SCR 608-18; Dkt. No. 19-1, R.T. at 2-42.

then showed [petitioner] three photographs of the alleged victim and asked [petitioner] if he recognized her. [Petitioner] stated no. Copies of the photographs that were shown to [petitioner] were admitted into evidence as People's Exhibit 2.

Investigator Rojek asked [petitioner] if he was willing to provide a DNA buccal swab from his mouth. [Petitioner] agreed and provided a DNA sample. Investigator Rojek then asked [petitioner] if he was willing to provide a written statement. [Petitioner] provided a written statement on the form that contained the *Miranda* warnings. In the statement, [petitioner] denied knowing the alleged victim and denied ever having sex with her. [Petitioner] signed the statement. A copy of the statement was admitted into evidence as People's Exhibit 1 at the suppression hearing.

*Id.*

The trial court found that Investigator Rojek's *Miranda* warnings "properly advised the [petitioner] of his right to remain silent and his right to counsel," and that petitioner "stated that he understood his rights and agreed to speak with Investigator Rojek without an attorney." *Id.* at 611. It denied petitioner's motion to suppress the December 2012 statements, concluding that petitioner " was not in custody on December 19, 2012 at the time he allegedly made the statements." *Id.* at 614. It found that petitioner "knowingly, intelligently, and voluntarily waived his right to remain silent and his right to counsel [at this point] when he initially agreed to speak with Investigator Rojek." *Id.* The trial court further concluded that petitioner's "statements were not the product of coercion or improper police conduct," and were made "voluntarily." *Id.*

The trial court, however, then found that had petitioner made any statements later in that same December 2012 interview, suppression would have been warranted. *Id.* at 611. The court described the subsequent portion of that interview as follows:

After the [above] statement was completed, Investigator Rojek informed [petitioner] that he believed [petitioner] *did* have sex with the alleged victim. The [petitioner] informed Investigator Rojek that he no longer wished to speak with him. Investigator Rojek continued to interrogate [petitioner] and informed him that DNA results confirmed that [Petitioner] had sex with the alleged victim. [Petitioner] then unequivocally invoked his right to counsel. Investigator Rojek continued to

7

> interrogate [petitioner], then informed [petitioner] that he had to make a phone call. He asked [petitioner] if he wanted a cup of coffee or anything to eat or drink. [Petitioner] declined. Investigator Rojek then left the room and turned off his digital audio recorder. A copy of the digital audio recording of the interview was admitted into evidence as People's Exhibit 4. No further evidence regarding what occurred after Investigator Rojek left the room was provided at the hearing.

*Id.*

The trial court reasoned that, had petitioner made any additional statements after he asserted that he no longer wished to speak with Investigator Rojek, those statements must be suppressed based on a "constitutional violation." *Id.* at 615.  In support, the court found that, "after [petitioner] was advised by Investigator Rojek that DNA confirmed that he had sex with the alleged victim and [petitioner] invoked his right to remain silent and his right to counsel, [petitioner] was in custody." *Id.*  Although "Investigator Rojek told [petitioner] that he had to make a phone call and asked him if he wanted a cup of coffee or something to eat," the trial court found "that no reasonable person, innocent of any crime, would believe he was free to leave under those facts." *Id.*  It further found "that Investigator Rojek did not scrupulously honor [petitioner's] invocation of his right to remain silent, nor his right to counsel, since he continued to briefly question him after the invocation of those rights." *Id.* The court noted, though, that "[n]o statement, however, appears to have been made by [petitioner] after the constitutional violation." *Id.*

### 2. *Sandoval/Ventimiglia* Hearing[10]

At the outset of petitioner's 2013 jury trial, as noted by the Appellate Division in petitioner's first direct appeal,

> before commencement of voir dire, defense counsel informed County Court that [petitioner] would be testifying at trial. During the ensuing *Sandoval* hearing, the

---

[10] Respondent did not include the motion papers, the trial court's ruling, or the relevant transcripts in the SCR.  The information provided in this Order, therefore, comes from the Appellate Division's order.

prosecutor stated that he wished to cross-examine [petitioner] with respect to three criminal convictions: a 2008 misdemeanor conviction, for driving while intoxicated, a 2005 felony conviction, for sexual abuse in the first degree, and a 1994 felony conviction, for driving while intoxicated. With respect to the sexual abuse conviction, the prosecutor, acknowledging that "the nature of that offense" is "so similar to the present charge," requested a *Sandoval* compromise pursuant to which he would be allowed to ask [petitioner] "if he was convicted of a felony offense but not specify the title of that offense or the underlying facts." The [trial] court agreed to that request, noting that the probative value of allowing the jury to know of [petitioner's] prior sex offense "would not outweigh [its] prejudicial effect." With respect to the driving while intoxicated convictions, the court ruled that [petitioner] could be impeached with the misdemeanor but not the felony, which the court deemed too remote.

SCR 717-18.

### 3.    Motion to Dismiss Based on Legal Insufficiency

In its August 28, 2013 order, the trial court denied petitioner's motion, finding that "competent evidence presented was sufficient to support each element of the sole count of the [i]ndictment." *Id.* at 609-10.

## C.    November 2013 Trial

Thereafter, petitioner's first jury trial was held in Oswego County Court before County Court Judge W.W. Hafner, Jr. *Id.* at 139.[11] Following the jury's guilty verdict, Judge Hafner recused himself, and petitioner was sentenced by a different judge, Oswego County Court Judge, James M. Metcalf. *Id.* at 669.

### 1.    Prosecution Case

At the first trial, the victim testified that she had been raped, but because she was attacked from behind, she did not see the perpetrator during the assault. *Id.* at 706. She testified that she was, therefore, unable to identify petitioner as her attacker. *Id.* at 634 (citing RT at 291); *see also* SCR 690 (Respondent concedes in its first direct appellate

---

[11] Respondent did not include the SCR or reporters transcripts from the first trial, with the exception of the 2013 suppression hearing order.

brief that it "generally agree[s] with the summary provided by [petitioner] in his brief. . .

[and] accept[s] the [petitioner's] statement of facts, except as set forth in the individual

points discussed *infra*.").

The prosecution introduced evidence that petitioner's DNA matched the DNA

found in the semen obtained from the victim's vagina by the hospital during the rape kit

examination.  *Id.* at 705.

Additionally,

> at trial, the investigator who interviewed [petitioner] testified for the People, and the recording of that interview was played for the jury, including the parts that refer[red] to [petitioner] being a registered sex offender. The investigator testified that he developed [petitioner] as a suspect because [petitioner's] DNA profile in CODIS matched the DNA profile of the rapist

*Id.* at 718.

### 2.     Defense Case

Contrary to his December 2012 statements to Investigator Rojek, petitioner

admitted at trial that he had consensual sex with the victim at some time in the evening

prior to the assault.  *Id.* at 706.  Petitioner explained that the victim agreed to sex in

exchange for beer money.  *Id.* at 641, 706.  He claimed that after they had sex, he looked

in his wallet and pretended he had no money, after which the victim became angry.  Id. at

641.

On November 22, 2013, the jury convicted petitioner of first degree rape.  *Id.* at

138.

### D.     First Direct Appeal

Petitioner, represented by appellate attorney Bruce Bryan, appealed, arguing that he

was entitled to relief because: (1) the trial court erred in ruling that petitioner was not

10

permitted to introduce evidence that the victim exchanged sex for beer money; (2) his trial counsel, Edward Izyk, rendered ineffective assistance of counsel when he permitted introduction of evidence that petitioner was on the sex offender registry; (3) petitioner should have been granted a new trial when the trial judge recused himself from the case prior to sentencing; (4) there was insufficient evidence, and the verdict was against the weight of the evidence; (5) Petitioner's statement to the police investigator should have been suppressed; (6) the district attorney ("DA") should have been disqualified from trying the case under the "advocate-witness rule" because he was a prospective witness; (7) the trial court should have suppressed the rape kit evidence because the medical records relating to the rape examination were destroyed; and (8) petitioner's sentence was harsh and excessive.  *Id.* at 619-20.

On February 11, 2016, the Appellate Division reversed petitioner's conviction and remanded for a new trial, concluding that petitioner's trial counsel rendered ineffective assistance when he allowed introduction of petitioner's sex offender status at trial.  *Id.* at 717-20.  The appellate court noted in spite of a "favorable" *Sandoval* ruling,[12] petitioner's trial counsel nevertheless "did not object" to the prosecution's playing for the jury a version of the December 2012 audio recording with petitioner's unsuppressed statements to Investigator Rojek, which included "repeated mention . . .  of [petitioner's] status as a registered sex offender."  *Id.* at 718-19.  In addition to the references in the audio recording, the appellate court noted numerous other references at trial to petitioner's status as a sex offender.  *Id.* Specifically, petitioner's trial counsel referenced petitioner's sexual offenses during voir dire,

---

[12] As noted above, the trial court granted petitioner's *Sandoval* motion in part, allowing the prosecution "to ask merely whether [petitioner] was convicted of a felony," but not about the nature of the particular conviction for a sexual offense.  SCR 719.

his opening statement, during cross-examination of Investigator Rojek, during direct examination of petitioner, and during his closing statement. *Id.*

The Appellate Division noted that defense counsel's "theory [at trial] was that [petitioner] had consensual intercourse with the victim on the same day," but that she was raped by someone else. *Id.* at 719 (noting defense counsel's concession during closing argument that petitioner "had consensual intercourse with [the victim] earlier that same day in [the] same woods"). The appellate court further acknowledged that defense counsel's strategy was also to "allow the jury to know that [petitioner] was a registered sex offender and then argue that the police focused their investigation on [petitioner] because he was a registered sex offender." *Id.* (noting defense counsel's closing argument that although his "client is a registered sex offender," "[h]e's not here to be judged on his morality").

The appellate court found that counsel's theory was not unreasonable, but that his strategy was flawed, though, both because it was "based on a false premise" regarding the reason that law enforcement focused on petitioner and because "it was unnecessary for defense counsel to inform the jury that [petitioner] was a registered sex offender." *Id.* (determining that, "[i]n fact, any chance that the jurors would have believed [petitioner's] testimony about the intercourse being consensual was likely extinguished once they learned that he had previously committed a sex offense"). The Appellate Division concluded that trial counsel's strategy was "so 'egregious and prejudicial as to compromise. . . [petitioner's] right to a fair trial." *Id.* at 720 (citations omitted). In support, it noted "that [petitioner] received a favorable *Sandoval* ruling pursuant to which he could have testified at trial without being asked about the prior conviction of a sexual offense." *Id.* at 719 (noting "[t]he prosecutor was permitted to ask merely whether he was convicted of a felony"). The court reversed and

remanded for a new trial.

Of the seven other claims raised on direct appeal by petitioner, the Appellate Division reached only one other in addition to the above ineffective assistance claim upon which it granted relief. Notably, the Appellate Division found that petitioner's legal sufficiency and weight of the evidence claims were procedurally defaulted because petitioner failed to preserve the claims for its review. *Id.* Alternatively, the appellate court found that under state law, neither claim was meritorious. *Id.*

As for the remaining six claims, the Appellate Division summarily stated that it had reviewed them and "concluded that none constitutes a further ground for reversal." *Id.*

Respondent states that petitioner did not file a leave application in the New York Court of Appeals following the Appellate Division's remand and retrial. *See Dkt*. No. 17, Answer, at 1 (noting that "[t]he clerk's office for the New York Court of Appeals has informed this Office that although the People filed a leave application in that court following the Appellate Division decision, petitioner did not").

### E.    Pretrial Proceedings on Remand

On July 21, 2016, following remand to the Oswego County Supreme Court for retrial, petitioner, represented by new trial counsel, Edward Menkin, filed an omnibus motion with the second trial court, which included: (1) a motion to preclude reference to petitioner's status as a registered sex offender; (2) a motion to dismiss the indictment based on pretrial delay; and (3) a motion in limine to preclude admission of petitioner's testimony from the first trial on retrial. SCR 159-60.

Respondent agreed to preclude evidence of petitioner's prior sex offense conviction or his sex offender registry (also referred to as "SORA") status, and no such evidence appears

13

to have been introduced on retrial.  *Id.* at 249-50.

As for the second and third motions above, the parties briefed the issues, the trial court held evidentiary hearings and arguments, and the court denied the motions in November 29, 2016, and December 5, 2016 orders, respectively.

### 1.    *Singer* Hearing/Preindictment Delay

Petitioner moved to dismiss the indictment, arguing that his due process rights had been violated by the six-year, 103-day delay between the first September 2006 DNA match in the case and his May 30, 2013 indictment.[13]  *Id.* at 165-71.  Respondent countered that the delay was related to its need to obtain "a DNA sample from [petitioner] prior to making an arrest," noting that the Forensic Investigation Center ("FIC"), which made the September 2006 DNA lab match, "explicitly recommended that the police obtain a buccal swab from [petitioner] for purpose of a confirmation test."  *Id.* at 253.

In explaining the delay, respondent further noted that the Oswego County Sheriff's Office, for whom Investigator Rojek worked, did not have a role in the investigation until March 2010.  *Id.* at 254.  Once on board, it noted Investigator Rojek repeatedly attempted to make contact and speak with petitioner but was not successful in doing so until the December 19, 2012 interview.  *Id.*  Respondent noted that petitioner was arrested approximately one week after Oswego County received the positive DNA match results from the December 2012 buccal swab taken by Investigator Rojek.  *Id.*

Alternatively, respondent argued that "even if [the trial court] were to discount the investigatory steps taken by police and conclude that law enforcement showed unnecessary

---

[13] Petitioner initially stated that his motion to dismiss was "predicated on a Due Process argument and not a speedy trial violation."  SCR 348.  However, post-hearing, petitioner added that "[t]he instant claim is one based on the deprivation of a constitutional right (speedy trial)."  *Id.* at 435.

delay in arresting [petitioner], . . . a lapse in the investigatory process does not, by itself, demand dismissal, particularly when there is no evidence that [respondent] sought or obtained a tactical advantage through deliberate delay." *Id.* at 255.

Petitioner countered that after the first 2006 DNA "hit," respondent could have simply obtained a court order to obtain a subsequent buccal swab from him—and that the delay to obtain the swab otherwise was unnecessary. *Id.* at 346. Petitioner contended that, instead, the prosecutorial delay resulted from respondent's "misunderstanding of the law of probable cause and the facts which may support it." *Id.*

Following the briefing on the motion to dismiss based on preindictment delay, on October 6, 2016, the second trial court held a *Singer* evidentiary hearing to determine whether respondent had established "good cause" for the delay between the September 2006 DNA match and petitioner's January 31, 2013 arrest. *See People v. Singer*, 44 N.Y.2d 241, 254 (1978) (holding that "[g]enerally when there has been a protracted delay, certainly over a period of years, the burden is on the prosecution to establish good cause"); *see also* RT, Dkt. No. 19-1, at 91-370.

### *Singer Hearing Evidence*

Both parties submitted numerous exhibits, and respondent called five witnesses to testify at the *Singer* hearing, including three officers from the Village of Phoenix Police Department: Officers Donald Duszak, Joseph Marotta, and Kurt Brown. SCR 119-20 (exhibit list); *id.* at 452 (trial court order); RT, Dkt. No. 19-1, at 92 (witness list). Respondent additionally called Oswego County DA Gregory Oakes and Oswego County Investigator Rojek. RT, Dkt. No. 19-1, at 92; SCR 452.

The trial court recounted the evidence of the delay, which included the November

15

2016 hearing testimony, as follows:

> Donald Dujszak testified that he was a patrol officer for the Village of Phoenix Police Department at the time the victim was raped. He encountered the victim and took her to the hospital on July 31, 2005 at approximately 1:30 am. . . .  His last involvement with her was presenting her with a photo array on October 27, 2005. Officer Duszak left the Village of Phoenix Police Department approximately May 2008 and had no involvement with the investigation thereafter.

> Joseph Marotta was a police officer with the Village of Phoenix Police Department and was an investigator until he left the Village of Phoenix Police Department in August of 2006. He returned to the police department in December 2008 and when he returned, he had no involvement in the investigation of the alleged rape of the victim. Investigator Marotta testified that Chief Rod Carr would have been in charge of the investigation while he was Chief.  Investigator Marotta further testified that Chief Carr came to the police department just prior to Marotta leaving in August of 2006. Investigator Marotta stated that Sheriff Carmen Rojek of the Oswego County Sheriff's Department came to the police department in the Village of Phoenix asking for reports in 2010 of the alleged rape and that he had apparently taken over the investigation of the case.

> Officer Kurt Brown testified that he started with the Village of Phoenix Police Department in 1998[,] and he left the department on or about July 31, 2007. Officer Brown testified that he became aware of the DNA hit of the defendant in early to mid[-]2007 and the Oswego County District Attorney's Office had contacted him. The hit was pursuant to the letter received from the DNA Forensic Lab of the New York State Police dated September 7, 2006.  Officer Brown testified that he talked to Assistant District Attorney Todd in December 2005 about the case but there was no DNA hit until the report filed by the State·Police Forensic Lab September 7, 2006.

SCR 452.

In addition to the above witnesses, Oswego County DA Oakes, who was a special victims prosecutor at the time of the crime in 2005, and who subsequently prosecuted the case, also testified.  *Id.* at 452-53.  In early 2007, Oakes met with then-Phoenix Department police chief, Chief Carr, regarding the September 2006 DNA hit.  *Id.* at 360, 453.  Oakes testified that he recommended a buccal swab and that he also asked Phoenix police to "interview [petitioner] to see if he would make any admissions."  *Id.* at 360, 453.  Oakes stated that although the September 2006 DNA hit on petitioner would have constituted

16

"sufficient probable cause to arrest [petitioner]," the prosecution needed a buccal swab because it believed the 2006 DNA hit notification would have been inadmissible during a preliminary hearing.  *Id.* at 454, 304.

DA Oakes testified he did not receive any subsequent communications from Phoenix police between April 2007 and April 2009, when DA Oakes inquired of Chief Carr the status of the case.  *Id.*  On September 15, 2009, Chief Carr advised DA Oakes that Phoenix police had met with the victim, and Chief Carr provided DA Oakes with the victim's contact information and an address.  *Id.* at 362, 453.

DA Oakes subsequently met personally with the victim in late 2009 or early 2010, during which the victim stated "she did not voluntarily have sex with [petitioner] and that she did not know [petitioner]."  *Id.*  Around that same time, in March 2010, DA Oakes asked Investigator Rojek, from the Oswego County Sheriff's Office, to take over the case from the Phoenix Police Department.  *Id.* at 363, 453.  DA Oakes testified that "he had no documentary evidence of what the Village of Phoenix Police Department did between September 2006 and March 2010 on the case."  *Id.* at 454.

More than two years later, in April 2012, DA Oakes subsequently advised Investigator Rojek that he had received a letter from the victim, who was upset by the lack of progress on the case.  *Id.* at 367.  DA Oakes inquired regarding Rojek's progress and asked Rojek to prioritize the case.  *Id.*

At the October 2016 hearing, DA Oakes acknowledged that the prosecution could have sought a court order requiring petitioner to submit to a DNA sample after receiving the September 2006 DNA hit and prior to Rojek's interview and confirmatory sample in December 2012.  *See id.* at 454 (referencing *Matter of Abe A.*, 56 N.Y.2d 288 (1982) (holding under

17

New York law that subject of application for sample of bodily identification is entitled to opportunity to be heard before sample can be taken)).  However, DA Oakes explained that the prosecution chose not to because it did not want to "alert[] [petitioner] that he was a suspect in the rape," concerned that Petitioner would then "invoke his right to counsel."  *Id.* at 456.  Instead, the prosecution hoped to obtain an admission from petitioner.  *Id.*

Investigator Rojek testified at the October 2016 hearing that between July 19, 2010, and December 19, 2012, when he interviewed petitioner, he visited a residence in North Syracuse, New York associated with petitioner fourteen times in an attempt to make contact with petitioner—but with no success.  *Id.* at 455.  Investigator Rojek also reviewed Phoenix Police Department records and met twice with the victim during that same time frame.  *Id.*

At the conclusion of the *Singer* hearing, the trial court ordered additional post-hearing briefing.  RT, Dkt. No. 19-1, at 346.

### Post-Singer Hearing Briefing

Respondent argued post-hearing that the evidence established a "legitimate and reasonable basis for the delay," noting that law enforcement was seeking additional confirmatory DNA.  SCR 447.  Petitioner disagreed, arguing that, contrary to DA Oakes' testimony, the 2006 DNA notification would have been admissible at a preliminary hearing and at trial.  *Id.* at 305.  Petitioner thus argued that respondent "had no justifiable reason to delay the prosecution. . . until 2013," and that it could have proceeded in a "timely fashion" with the DNA match in 2006.  *Id.* at 433.

### Trial Court's Singer Ruling

In a November 2016 order, the trial court found the three Phoenix police officers' testimony "demonstrated that little, if any, effort was made to interview [petitioner] between

18

the dates of notification of the [DNA] hit [in September 2006] . . . and the ultimate turnover of the case to Investigator Rojek in March. . .2010." *Id.* at 457. It found that "[t]he majority of the attempts to interview [petitioner] took place in 2012, ultimately culminating in the interview on December 19, 2012. . . ." *Id.* at 458.

The trial court additionally found that there was no precedent regarding "any standard of proof specifically that the [prosecution] ha[s] to meet in order to demonstrate good faith for not commencing a prosecution when a pre-indictment delay occurs." *Id.* at 459. Given the absence of a set standard, the court found that "good faith" should be "based on the specific facts" of the case. *Id.*

In assessing petitioner's due process violation based on preindictment delay, the court noted that the New York State Constitution was "much broader" on the issue than the United States Constitution, and it applied New York's five-factor test from *People v. Taranovich*, 37 N.Y. 2d 442, 445 (1975).[14] While the trial court did not definitively rule on each of the *Taranovich* factors, it discussed each and determined overall that respondent "had a good faith basis to defer the prosecution and did not do so to seek a tactical advantage against [petitioner]." SCR 470. The trial court thus ultimately concluded that petitioner had "not been deprived of due process" under the United States Constitution or the New York Constitution. *Id.*

---

[14] The *Taranovich* factors include: "(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay." 37 N.Y.2d at 445. "[N]o one factor or combination of the factors . . . is necessarily decisive or determinative of [a] speedy trial [or prompt prosecution] claim, but rather the particular case must be considered in light of all the factors as they apply to it." *Id.*

**2.      Petitioner's Motion to Preclude Admission of Prior Testimony**

In addition to the above motion, prior to retrial, petitioner moved to preclude admission of his first trial testimony at the retrial. *Id.* at 171. In doing so, petitioner suggested that he had not yet decided whether he would testify at the second trial. *Id.* Assuming petitioner chose not to testify at the second trial, he argued that respondent should not be permitted to introduce his first trial testimony because he constituted an "unavailable" witness. *Id.* Additionally, petitioner argued that the only reason his first trial testimony existed—in which he incriminated himself by admitting to sexual intercourse with the victim—was due to the faulty strategy employed by his first trial counsel, which the appellate court found constituted ineffective assistance of counsel. *Id.*

Respondent countered that petitioner's decision to testify at the first trial was not wrongfully induced by the prosecution or police. It further argued that it was reasonable to assume that petitioner testified to offer an alternative theory and/or to explain the presence of his DNA in the sexual assault kit. *Id.* at 262-63.

At the August 30, 2016 motion hearing, petitioner clarified that his argument was that "the ineffectiveness of his [first trial] counsel r[ose] to such a degree that [petitioner was] denied his constitutional due process [right] not to testify and incriminate himself because he was forced to get on the witness stand" since his trial counsel admitted into evidence that he was a registered sex offender. RT, Dkt. No. 19-1, at 65.

Petitioner's second trial counsel, Menkin, explained further the theory behind the motion, noting:

> [T]he decision to testify is a critical decision in any trial for a defendant, but we're simply ignoring reality, as well as the law by saying that you don't depend upon--- upon the advice of counsel to step forward, take the stand, and give up the right to remain silent. So what I'm saying is, there's an infection of the ineffective

20

assistance of counsel that paints that night – you know, I offered case law in support of that – that there's no question that the argument is not based upon suppression stemming from government misconduct.  They have nothing to do with it. It has to do with his deprivation of his right to counsel, that is a matter of law. Okay?  And that is to say had he—had—I mean, I don't want to stand here and beat up on a colleague or, you know, a peer. I don't know the prior trial counsel but that was a mistake.  [Petitioner] should not have testified.  And -- and I don't see how you separate out a finding from the Appellate Division that as a matter of law, this was ineffective assistance of counsel that so tainted this, we're going to retry a B felony, okay, from -- I don't see how you separate that out from advice to the defendant to testify on his own behalf.  And I'll rely on the papers that I submitted on -- you know, in that argument.  I mean, I agree -- I agree with you, it has nothing to do with government misconduct that should lead to suppression.  It has nothing to do with that. The argument is, he's been deprived of a constitutional right, and there's gotta be a remedy for it.

Respondent countered at the August 2016 hearing that:

Regarding the preclusion of [petitioner's] prior testimony, [a]gain I appreciate counsel recognizing and conceding there was no police misconduct. There was no misconduct by the prosecution compelling [petitioner] to testify in this matter. And I appreciate the defense's argument that he was deprived of the fundamental right, which is right to effective assistance of counsel. And really, this appears to be an issue of first impression. I couldn't find any cases directly on point. But the basis of preclusion is such an extreme remedy that it's meant to curb against misconduct by the police or prosecution. Simply, if we do something wrong, or if there's an improper basis to admit evidence, the Court should preclude it.

*Id.* at 69.

Following argument, the trial court subsequently suggested that there may be a "compromise position" on the motion.  *Id.* at 70.  The judge explained, directing respondent's counsel to consider the issue further:

I guess the question you've got to use in your mind as the district attorney is, do you need to put it in as direct evidence? And that's a tactical move from you, because your previous predecessor. . .   I used to tell him, be careful what you ask for from a judge, because you may get it.

. . . .

[M]y point is, as a tactician, unless Mr. Menkin [defense counsel], who's an excellent lawyer, obliterates the witness on the stand, you've got the D.N.A., you've got her saying it was forcible. And if I was a lay juror, I'd be sitting there saying,

21

well, why isn't he getting up -- not that he has to. They'll be instructed, of course. But why -- if it's his D.N.A., she said she was forced, why isn't he getting up and saying it was consensual? You have to make a decision in your mind, do you really need it. Except you have a problem with the prior testimony that she -- she identified one guy, and maybe another guy first, and, you know, without putting that direct evidence on which corroborates, I was there, we're in the woods, we had sex. His version is, I didn't pay her, so she got mad at me. I mean, that is an offshoot that -- with that testimony, a jury could believe she's not telling the truth, I suppose.  So it's a -- it's nothing germane, *per se*, to this decision, but that's a decision you've gotta make. At this time I take it that you intend to use the direct evidence, and I'll rule accordingly on it.

*Id.* at 70-71.

In its subsequent December 5, 2016 order, the trial court denied the motion to preclude respondent from using petitioner's redacted first trial testimony in respondent's direct case on retrial. [15]  SCR 474.  In so holding, the court rejected the reasons proffered by petitioner for his first testimony:  that his testimony was mandated by the ineffective assistance of his first trial counsel.  *Id.*  Instead, the trial court found that petitioner's testimony at the first trial was required by the positive DNA evidence and the victim's testimony that she was raped by an assailant whom she was unable to identify.  *Id.*  The court reasoned that petitioner's testimony was necessary "to refute the allegation of rape or forcible sexual intercourse [under] the defense theory that consensual sex was proffered."  *Id.*  (noting that while first appellate court found ineffective assistance based on admission of petitioner's sex offender status, it explicitly held that it was *not* "say[ing] that defense counsel pursued an unreasonable defense theory at trial" in advancing the theory that the sexual intercourse was consensual).  *Id.*

---

[15] As noted, on a related motion, Respondent, however, agreed to redact all references to petitioner's sex offender status and/or the nature of this prior sex offense conviction at retrial.

22

### F.    2017 Bench Trial/Retrial

On December 30, 2016, several days prior to trial, petitioner waived his right to retrial by jury, and Oswego County Supreme Court Judge McCarthy presided over the bench trial. RT, Dkt. No.19 -1, at 382-504; RT, Dkt. No. 19-2, at 193; and RT, Dkt. No. 19-4, at 1-101.  As noted by the Appellate Division, "the evidence at the retrial was largely the same as the evidence at the first trial," with the exception that evidence and/or argument regarding petitioner's status as a registered sex offender was not introduced.  SCR 579.

### 1.    Prosecution Case

In its closing argument, the prosecution noted that the sperm in the victim's vagina was a perfect match for petitioner, and that the evidence of the victim's injuries were consistent with being grabbed by the neck and dragged from behind.  RT, Dkt. No. 19-4, at 80-81.  The prosecution further noted that the victim testified that there was only one incident of sexual intercourse on the night in question—and that was when she was raped.  *Id.* at 84. Additionally, the victim also had grass stains on her knees consistent with her description of the rape.  *Id.* at 82.

Because she was attacked from behind, the prosecution argued that it would have been difficult for her to identify her attacker.  *Id.* at 90-91.  Thus, her failure to identify petitioner did not undermine her testimony or the prosecution's case.  *Id.*  The prosecution additionally challenged petitioner's argument that the victim was intoxicated, noting that six beers over a period of five and one-half hours did not render her intoxicated.  *Id.*

The prosecution also argued that petitioner's testimony was not credible given his inconsistent statements to Investigator Rojek in December 2012, in which he asserted that he did not know or have sex with the victim.  *Id.* at 88.  It further noted that the date of the rape

23

would have been memorable because it was petitioner's birthday.  *Id.*  The prosecution thus suggested that petitioner denied knowing the victim during his earlier interview not because of a memory lapse but because he knew he would be in trouble.  *Id.*

### 2.    Defense Case

The defense argued that the victim's testimony regarding the rape was not credible, asserting that the victim was intoxicated and noting that she initially identified her assailants as "teenagers" when petitioner was, in fact, thirty-five years-old at the time.  SCR 60-65, 72. The defense further argued that petitioner's testimony that he had consensual sex with the victim was credible.  *Id.*

On January 6, 2017, the trial judge found petitioner guilty of first degree rape after his second trial.  RT, Dkt. No. 19-4, at 99.

### G.    Second Direct Appeal

Petitioner, represented by a new appellate attorney, Bradley Keem, filed a second direct appeal, arguing that (1) the six-year preindictment delay violated petitioner's due process rights; (2) the second trial court should have precluded admission of petitioner's testimony from the first trial; (3) petitioner's conviction was not supported by legally sufficient evidence and was contrary to the weight of the evidence; and (4) that the trial court imposed an unduly harsh and severe sentence.  SCR 2-3.

On July 1, 2022, the Appellate Division affirmed the conviction.  *See id.* at 579-83 (*People v. Stefanovich*, 207 A.D.3d 1047 (4th Dep't 2022)).  In support, it noted that "[a]lthough the victim was unable to identify [petitioner] at trial, his DNA linked him to the crime, and he acknowledged during his testimony that he had sexual intercourse with the victim on the date in question but claimed that it was consensual."  SCR 579.

24

Regarding petitioner's first claim, the state appellate court, like the trial court, considered New York's five-factor test from *Taranovich*, 37 N.Y. 2d at 445.  SCR 580-81.  It concluded that the trial court did not err in refusing to dismiss the indictment based on the preindictment delay because at least three of the five *Taranovich* factors weighed in favor of the prosecution.[16]  SCR 580-81.  Additionally, the appellate court concluded that petitioner had not shown any prejudice as a result of the delay.  *Id.*

As for petitioner's second claim regarding the preclusion of his first testimony from trial, the Appellate Division also denied that claim, reasoning:

> Because the People did not ultimately seek to admit [petitioner's] testimony from the first trial at the retrial, [petitioner] was not prejudiced by the court's ruling, even assuming, *arguendo*, that it was improper. We note that [petitioner] took the stand and offered testimony consistent with his testimony at the first trial. Under the circumstances, there is no basis for reversal arising from the denial of [petitioner's] preclusion motion.

*Id.* at 579.

The appellate court additionally denied petitioner's claim regarding the legal sufficiency and weight of the evidence.  *Id.* at 580.

Petitioner filed a counseled application for leave to appeal to the New York Court of Appeals, asking that the Court of Appeals review his due process claim regarding the preindictment delay, his claim regarding the admission of his first trial testimony, and his claim regarding the legal sufficiency and weight of the evidence.  *Id.* at 584-96.  On September 29, 2022, the Court of Appeals denied petitioner's application.  *Id.* at 607.

---

[16] The dissent disagreed and found that at least four of the five factors favored petitioner such that the six-year plus delay deprived him of his right to due process.  SCR 582-83.

### III.    PRESENT PETITION/ISSUES

Petitioner argues that he is entitled to federal habeas relief because:  (1) his due process rights were violated by the prosecution's unjustified delay in indicting him, Pet. at 5-7, 32-36; (2) the trial court ruling denying his motion to preclude his first trial testimony on retrial violated his due process rights, *id.* at 7-8, 36-38; (3) his conviction was not supported by legally sufficient evidence and was against the weight of the evidence, *id.* at 8-10, 38-40; and (4) the trial court should have suppressed all December 2012 statements he made to Investigator Rojek, *id.* at 10-11, 41-42.

Respondent opposes the Petition, arguing that petitioner's first and fourth claims above are unexhausted, procedurally defaulted, and meritless.  Oppos. at 19-27, 38-42. Regarding petitioner's third claim as to his testimony, respondent contends the state appellate court reasonably denied the claim on the merits.  *Id.* at 27-32.  Finally, as for petitioner's second legal sufficiency and weight of the evidence claim, respondent asserts that the claim is not cognizable and/or that the state court reasonably rejected the claim on the merits.  *Id.* at 32-38.

Petitioner filed a reply, which argued that to the extent his first and fourth claims were record-based and unexhausted, the Court's failure to consider the claims on the merits would "result 'in a fundamental miscarriage of justice'" based on new evidence and/or his appellate counsel's inability to raise the claims.  Reply at 2-3.  As for his remaining claims, petitioner "refer[red]" the Court "to the record."  *Id.*

26

## IV.    LEGAL STANDARDS FOR HABEAS RELIEF

### A.    Entitlement to Federal Habeas Relief

"[H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision: (1) was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. §§ 2254(d)(1), (2); *see also Brown v. Davenport*, 596 U.S. 118, 127 (2022); *Cullen v. Pinholster*, 563 U.S. 170, 180-81, 185 (2011). This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted)).

To obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.  "The petitioner carries the burden of proof." *Cullen*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

27

### 1.    Clearly Established Federal Law

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  "[F]ederal habeas corpus relief does not lie for errors of state law." *Id.* at 67.

Only Supreme Court decisions constitute clearly established federal law for habeas purposes.  *See Brown*, 596 U.S. at 136; *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (per curiam) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court[.]'  It therefore cannot form the basis for habeas relief under AEDPA." (citation omitted)).  The Court will not set aside state court rulings on habeas review for being at odds with Supreme Court dicta.  *See Rodriguez v. Miller*, 537 F.3d 102, 109 (2d Cir. 2008) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000) ("the phrase ["clearly established Federal law"] 'refers to the holdings, as opposed to the dicta, of this Court's decisions'").

### 2.    "Contrary to" Clearly Established Federal Law

A state court decision is "contrary to" clearly established Supreme Court precedent if: (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law;" or (2) the state court decides a case differently from a decision of the Supreme Court on a materially indistinguishable set of facts.  *Williams*, 529 U.S. at 405 (O'Connor, J., concurring).

### 3.    Unreasonable Application of Clearly Established Law

A state court unreasonably applies federal law when it correctly identifies the governing legal principles, but (i) applies those principles to the facts of the case in an

28

objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend established principles to a new context where they should apply.  *See Serrano v. Fischer,* 412 F.3d 292, 296 (2d Cir. 2005) (citing *Williams*, 529 U.S. at 413); *see also White v. Woodall*, 572 U.S. 415, 426 (2014) (An "unreasonable application of" clearly established federal law occurs when the state court "correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case.").  Such holdings must be "'objectively unreasonable,' not merely wrong; even 'clear error' will not suffice." *White*, 572 U.S. at 419 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003)); *see also Nevada v. Jackson*, 569 U.S. 505, 508-509 (2013) (per curiam) ("[A] federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents.'") (quoting *Harrington*, 562 U.S. at 102).

### 4.    Unreasonable Determination of Facts

An alternative to habeas relief under § 2254(d)(1), § 2254(d)(2) requires petitioner to show that the state court's decision on the merits "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The Court "may not characterize . . . state-court factual determinations as unreasonable 'merely because [the Court] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

29

Section 2254(d)(2) "requires that [the Court] accord the state trial court substantial deference." *Brumfield*, 576 U.S at 314. "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Wood v. Allen*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333, 341–42 (2006)). Under the "unreasonable determination of facts clause, § 2254(d)(2), a federal court will 'presume the correctness of state courts' factual findings unless [petitioner] rebut[s] this presumption with clear and convincing evidence.'" *Laboriel v. Lee*, No. 21-338-PR, 2022 WL 4479527, at *2 (2d Cir. 2022) (quoting *Schriro*, 550 U.S. at 473-74). A federal habeas court's deference to a state court's reasonable determination of facts under § 2254(d)(2) "does not [however] imply abandonment or abdication of judicial review." *Brumfield*, 476 U.S. at 314 (holding that state court's finding regarding prosecutor's race-neutral reason for striking prospective jury constituted an unreasonable determination of the facts).

### 5.    Prejudice

Finally, "a federal court cannot grant relief [in a § 2254 habeas case] without first applying both the [prejudice] test [the Supreme] Court outlined in *Brecht* [*v. Ambrahmson*, 507 U.S. 619, 623 (1993),] and the one Congress prescribed in AEDPA."[17] *Brown*, 596 U.S. at 127 ("[S]atisfying *Brecht* is only a necessary, not a sufficient, condition to relief. AEDPA too must be satisfied."); *accord Gumbs v. Towns*, No. 23-7244, 2024 WL 4707218, at *1 (2d

---

[17] In April 2022, the Supreme Court decided *Brown,* which clarified that "to grant relief," a federal habeas court "must find that the petitioner has cleared both tests" under AEDPA and *Brecht*. 596 U.S. at 134 (noting that the two tests "pose courts with different questions to resolve and require courts to answer those questions based on different legal materials").

Cir. Nov. 7, 2024) (citing *Brown*, 596 U.S. at 122); *see also Spencer v. Capra*, 788 F. App'x 21, 23–24 (2d Cir. 2019) (holding that "although the district court [on habeas] correctly inquired as to whether the error at [petitioner's] trial yielded a 'substantial and injurious effect or influence on the jury verdict [under *Brecht*], recent Supreme Court precedent . . . [also] require[d] considering whether the state courts' harmlessness determinations were unreasonable").

First, under AEDPA, where the state court has applied the correct standard and determined that an error was harmless beyond a reasonable doubt, "a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable." *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (emphasis omitted) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)); *Brown*, 596 U.S. at 136.

Additionally, under the *Brecht* prejudice test, a habeas petitioner is not entitled to relief unless the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Brecht*, 507 U.S. at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)).

The proper question in assessing harm under *Brecht* is, "Do I, the judge, think that the error substantially influenced the jury's decision?" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). If the court is convinced that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand. *See id.* at 437. If, on the other hand, the court is not fairly assured that there was no effect on the verdict, it must reverse. *See id.* at

31

437–38.  In the "narrow circumstance" in which the court is in "grave doubt" about whether the error had substantial and injurious effect or influence in determining the jury's verdict, it must assume that the error is not harmless and the petitioner must win.  *Id.* at 437–44 (relief granted because record so evenly balanced that conscientious judge in grave doubt as to harmlessness of error).

### B.    Exhaustion of State Court Remedies

An application for a writ of habeas corpus may not be granted until a petitioner has exhausted all remedies available in state courts.  *See Grey v. Hoke*, 933 F.2d 117, 119 (2d Cir. 1991) ("Under 28 U.S.C. § 2254(b), applicants for habeas corpus relief must exhaust[ ] the remedies available in the courts of the State.") (internal quotation marks omitted).  "The exhaustion requirement 'is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings."  *Jimenez v. Walker*, 458 F.3d 130, 148-49 (2d Cir. 2006) (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)).

Proper exhaustion has both a procedural and a substantive component.  *See Trimm v. Sheahan*, No. 14-CV-905 (TJM/DEP), 2014 WL 3670723, at *1 (N.D.N.Y. July 23, 2014) ("To satisfy the exhaustion requirement, a petitioner must do so both procedurally and substantively.").  Procedural exhaustion requires that a petitioner raise all claims in state court prior to raising them in a federal habeas corpus petition.  *See Rose*, 455 U.S. at 520.  Substantive exhaustion requires that a petitioner "fairly present" each claim for habeas relief in "each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim."  *Trimm,* 2014 WL 3670723, at *1 (quoting *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)) (citations omitted).  In

32

other words, a petitioner "must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Unexhausted claims are generally barred from habeas review by the rules concerning procedural default. *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)).

### C.    Procedural Default

"Procedurally defaulted claims are not subject to habeas review unless a petitioner shows cause for the default and that actual prejudice results, or that the denial of habeas relief would result in a fundamental miscarriage of justice." *Wright v. Lamanna*, No. 9:18-CV-1063 (MAD/TWD), 2021 WL 5095292, at *4 (N.D.N.Y. Apr. 21, 2021), *report and recommendation adopted*, No. 9:18-CV- 1063 (MAD/TWD), 2021 WL 4452094 (N.D.N.Y. Sept. 29, 2021) (citing *House v. Bell*, 547 U.S. 518, 536-39 (2006), and *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). To satisfy the "cause" requirement, a petitioner must demonstrate that "an objective external factor impeded his ability to comply with the relevant procedural rule." *Wright*, 2021 WL 5095292, at *4; *see also Maples v. Thomas*, 565 U.S. 266, 280 (2012); *Coleman v. Thompson*, 501 U.S. at 753. Prejudice, in turn, requires a petitioner to show "not merely that the errors at. . . trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Wright*, 2021 WL 5095292, at *4 (quoting *Murray v. Carrier*, 477 U.S. 478, 494 (1986)).

There is, additionally," an exception to the procedural bar in cases where a petitioner can prove actual innocence." *Wright*, 2021 WL 5095292, at *5 (quoting *McGuigan v. Perkins*,

569 U.S. 383, 392 (2013) ("[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims. . .  on the merits notwithstanding the existence of a procedural bar to relief.")).  "[A]ctual innocence means factual innocence, not mere legal insufficiency."  *Wright*, 2021 WL 5095292, at \*5 (quoting *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002)). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts or critical physical evidence—that was not presented at trial." *Id.* (quoting *Schlup*, 513 U.S. at 324); *see also Whitley v. Senkowski*, 317 F.3d 223, 225 (2d Cir. 2003).  In addition, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  *Id.* (quoting *House*, 547 U.S. at 536-37; *see also Doe v. Menafee*, 391 F.3d 147, 160-62 (2d Cir. 2004).

## V.    DISCUSSION

### A.    Admission of Petitioner's December 2012 Statement to Investigator Rojek

Petitioner argues, as he did in his first direct appeal, that the trial court should have suppressed the entire December 2012 interview with Investigator Rojek because his statements were coerced.  Pet. at 41-42; *see also* Oppos. at 38; SCR 677-78.  Additionally, petitioner suggests for the first time before this Court that his statements should also have been suppressed because they were "inaccurate."[18]  Pet. at 41-42; Oppos. at 38.

In opposition, respondent breaks the federal habeas claim down into two sub-parts: the coercion and the accuracy of petitioner's statements.  Oppos. at 38-39.  Respondent first

---

[18] Regarding the accuracy of his interview statements, petitioner's claim appears to be an attempt to explain away the inconsistencies with his subsequent trial testimony – e.g., that his December 2012 statements were inaccurate because they contradicted his subsequent trial testimony.

contends that the coercion sub-part is unexhausted and procedurally defaulted because petitioner failed to seek leave to appeal the claim to the New York Court of Appeals after the Appellate Division denied the claim on his first direct appeal.  Respondent additionally contends that the inaccuracy sub-part is unexhausted and procedurally defaulted because it was not raised at all before the state appellate courts.  *Id.* at 39.

Petitioner replies that even if it is "true" that the claim is unexhausted, the Court's failure to consider the claim would result in a "fundamental miscarriage of justice' based upon new evidence discovered."  Reply at 2.

### 1.    Exhaustion/Procedural Default

### a.    Inaccuracy Sub-Claim

The Court agrees the inaccuracy sub-claim is unexhausted and thus procedurally barred having never been addressed by any of the state courts.  As a result, it is unreviewable unless petitioner can show cause for the default and actual resulting prejudice, or show cause that the denial of habeas relief would result in a fundamental miscarriage of justice, "i.e., that he is actually innocent of the crime for which he has been convicted." *Dunham*, 313 F.3d at 730 (citing *Schlup*, 513 U.S. at 321); *see also House*, 547 U.S. at 536–39.

Here, the petition fails to identify any cause for petitioner's default.  As for petitioner's assertion that the Court's failure to consider the sub-claim will result in a "fundamental miscarriage of justice' based upon new evidence discovered," petitioner has not set forth any "new, reliable evidence" not presented at trial, and the conclusory allegation set forth in his reply does not establish that "no reasonable juror would find him guilty beyond a reasonable doubt." *Adsit v. Annucci*, No. 9:16-CV-00817 (GTS/CFH), 2018 WL 1175090, at *6 (N.D.N.Y.

35

Jan. 11, 2018), *report and recommendation adopted*, No. 9:16-CV-0817 (GTS/CFH), 2018 WL 1175212 (N.D.N.Y. Mar. 5, 2018) (citing and discussing *Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012)).

Accordingly, there is nothing to save petitioner's unexhausted and thus procedurally defaulted inaccuracy sub-claim, and habeas relief is precluded.

### b.    Coercion Sub-Claim

As discussed, the coercion sub-claim was the subject of a motion to suppress and a *Huntley* evidentiary hearing before the first trial court.  Petitioner then raised the issue on his first direct appeal, but he did not subsequently raise the issue again on retrial.[19] *See* SCR 162-76 (petitioner's July 2016 omnibus pretrial motions); *id.* at 118- 23.   As a result, petitioner also did not raise the issue in his second direct appeal or in his 2022 leave application.  *Id.* at 2-3, 584-606.

Respondent contends petitioner's claim is unexhausted because he failed to raise it in a leave application following his first direct appeal.  Respondent is correct that the Second Circuit has held that "to invoke 'one complete round of the State's established appellate review process,' a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of

---

[19]Here, the reasons are unclear from the docketless SCR and/or the motion papers included in the Court's SCR.  However, presumably, the issue was barred by law of the case on retrial and/or the second trial court adopted the first trial court's ruling. *See People v. Morgan*, 230 A.D.3d 864, 868, *leave to appeal granted*, 42 N.Y.3d 973 (2024), *and aff'd*, 45 N.Y.3d 940 (2025) (noting that "reconsideration of defendant's suppression motion [on retrial was] barred by the law of the case" because "[t]he issue was fully decided as part of the initial trial").

In future cases, to enable the Court to conduct meaningful review, respondent should include the relevant state court docket sheet(s) in the SCR filed with the federal habeas court.

Appeals for a certificate granting leave to appeal." *Smith v. Duncan*, 411 F.3d 340, 345 (2d Cir. 2005) (quoting *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005)) (internal citation omitted).

It is unclear from the record and respondent's briefing of the issue, though, whether the coercion sub-claim is truly unexhausted. Respondent has not addressed whether, under New York law, petitioner was in fact required to file a leave application given that the first state appellate court, on direct appeal, granted relief, reversing and remanding the case for a new trial. Oppos. at 39. Given this lack of clarity, the Court has addressed the issue on the merits. *See* 28 U.S.C. § 2254(b)(2) (under AEDPA, a federal habeas court may still deny a claim on the merits "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); *see also Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (same).

Regardless of whether the coercion claim is exhausted or unexhausted, it is meritless because petitioner knowingly, intelligently, and voluntarily waived his *Miranda* rights during the first portion of the December 2012 interview, and his statements were not overborne by coercion. That is the case whether this Court reviews the state court's decision under AEDPA's deferential standard, or whether the Court reviews it *de novo*.[20]

---

[20] Relevant case law suggests that if the claim is truly unexhausted, any review on the merits by this Court should be *de novo*. *See Nickels v. Conway*, No. 10-CV-0413, 2015 WL 4478970, at *18 (W.D.N.Y. July 22, 2015) (AEDPA "does not articulate a standard for denying a petition pursuant to Section 2254(b)(2), and neither the Supreme Court nor the Second Circuit has established one.") (quoting *Keating v. New York*, 708 F. Supp. 2d 292, 299 n.11 (E.D.N.Y. 2010)); *see also Berghuis*, 560 U.S. at 390 (stating that district courts can "deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review"); *DeVault v. Griffin*, No. 16-CV-7281, 2020 WL 5209731, at *2 (S.D.N.Y., Aug. 31, 2020) ("[A] petitioner's unexhausted claims can be denied on their merits under a *de novo* standard of review.") (citing 28 U.S.C. § 2254(b)(2) and *Berghuis*, 560 U.S. at 390)).

### 2.    Merits

As noted, Petitioner challenged the trial court's admission of the 2012 interview statements in his first counseled direct appeal to the Appellate Division.  SCR 677-78.  Citing *Davis v. North Carolina*, 384 U.S. 737 (1960), and *Rogers v. Richmond*, 365 U.S. 534 (1961), petitioner contended that his statements were involuntary because Investigator Rojek failed to advise him that he was the target of the investigation and gave him "the false impression he was helping the police find someone else as the perpetrator."  SCR at 678, 639; *see also Davis*, 384 U.S. at 740 (holding defendant's confessions were involuntary and coerced where he was taken into custody by police and interrogated repeatedly over sixteen days); *Rogers*, 365 U.S. at 541-45 (defendant's confession was coerced when it was obtained in response to a police threat to take defendant's wife into custody).

Respondent countered the trial court properly concluded there was no coercion and that petitioner's statements were voluntary.  SCR 708.  It noted Investigator Rojek testified he did not inform petitioner he was a target of the investigation because he wanted to provide petitioner with the opportunity "to explain his knowing the victim and having consensual intercourse with her."  *Id.*  Respondent further argued the law does not require a suspect be informed he is a target, and the strategy employed here was not the product of trickery.  *Id.*

As noted, the Appellate Division summarily denied the claim after it reversed and remanded on petitioner's ineffective assistance claim.  *Id.* at 720 (noting that "none [of the other claims, including this one] constitute[d] a further ground for reversal"). Because the appellate court summarily denied the claim without any rationale, the Court "look[s] through" the Appellate Division's summary denial to the last written, reasoned decision—the first trial court's August 2013 order denying petitioner's motion to suppress the December 2012

38

interview statements.  *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000); SCR 610-16.

As discussed, the trial court split petitioner's December 2012 interview with Investigator Rojek into two periods in ruling on his motion to suppress:  (1) the period before petitioner advised Investigator Rojek that he no longer wished to speak with him; and (2) the period after petitioner advised Investigator Rojek that he no longer wished to speak with him. SCR 611.  The trial court held that petitioner's statements during the first period were voluntary and were not the product of coercion or a *Miranda* violation.  *Id.* at 611, 614.  As for the second period, the trial court held that had petitioner made any statements, those statements would have required suppression because he had invoked his *Miranda* rights at that point and was in custody.  *Id.* at 615.

Neither the trial court's decision nor the Appellate Division's summary affirmance of the trial court contradicted or unreasonably applied United States Supreme Court law.  Nor did they unreasonably determine the facts in finding that petitioner "knowingly, intelligently, and voluntarily waived his right to remain silent and his right to counsel when he initially agreed to speak with Investigator Rojek," and that his " statements were not the product of coercion or improper police conduct," but were made "voluntarily."  *Id.* at 614.

First, the trial court reasonably concluded that petitioner was properly *Mirandized* and that he "knowingly, intelligently, and voluntarily" waived his *Miranda* rights during the first portion of his December 2012 interview with Investigator Rojek.  *Id.* at 611-14.  A suspect's waiver of his *Miranda* rights is effective if it is knowing and voluntary under a totality of the circumstances.  *See Berghuis*, 560 U.S. at 382–83.  As noted by the trial court, after Investigator Rojek accurately read petitioner his *Miranda* rights from a form, petitioner "stated

39

that he understood his rights and agreed to speak with Investigator Rojek without an attorney." SCR 611, 179, 181; RT, Dkt. No. 19-1, at 13-14.

Furthermore, the trial court also reasonably determined that petitioner's conversation with Investigator Rojek was voluntary and not the product of coercion. *See* SCR 614. The relevant question in determining voluntariness is "whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth." *Rogers*, 365 U.S. at 544. In determining voluntariness, a court must look to the totality of the circumstances in which the confession was given. *See Arizona v. Fulminante*, 499 U.S. 279, 282–89 (1991). The relevant factors include the defendant's background and experience, the conditions of his interrogation, and the conduct of the law enforcement officers. *See United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir.1995).

Here, the interview lasted approximately thirty-three minutes, petitioner was *Mirandized*, was not handcuffed, was offered something to eat or drink, and left the building and was not detained after the interview. *See* RT, Dkt. No. 19-1, at 14-16; SCR 194. Moreover, petitioner "does not point to any questions he posed to [Investigator Rojek] about the purpose or scope of the investigation, let alone to any allegedly false answers by [Investigator Rojek] to such questions." *United States v. Lincoln*, No. 19-CR-6047, 2019 WL 7198227, at *13 (W.D.N.Y. Dec. 23, 2019), *report and recommendation adopted*, No. 19-CR-6047, 2020 WL 3286472 (W.D.N.Y. June 18, 2020) (holding that three-hour interview after which the defendant was detained was not coercive where the officers "sought to minimize the severity of [the defendant's] circumstances").

40

Investigator Rojek's statements referring to petitioner as a "good guy" and enlisting petitioner's help in "clos[ing] out" an old case were not sufficiently coercive that they rendered petitioner's statements or his initial waiver of his *Miranda* rights involuntary.  SCR 178-80, 184; *see United States v. Mitchell,* 966 F.2d 92, 100 (2d Cir. 1992) (defendants' statements voluntary even though agents deemphasized criminal nature of inquiry and emphasized cooperation where they did not misrepresent, the criminal nature of the inquiry.).  "[I]t is well-settled that law enforcement officers are not required to disclose the crime under investigation prior to or during an interrogation."  *Lincoln*, 2019 WL 7198227, at *13 (citing *Colorado v. Spring*, 479 U.S. 564, 577 (1987) ("the failure of law enforcement officials to inform [the defendant] of the subject matter of the interrogation could not affect [the defendant's] decision to waive his Fifth Amendment privilege in a constitutionally significant manner [because] a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intentionally waived his Fifth Amendment privilege")); *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987) ("Simple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless the defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead.") (internal quotation omitted); *United States v. Maney*, 2006 WL 3780813, at *10 (W.D.N.Y. Dec. 21, 2006) ("[defendant] points to no evidence that either agent affirmatively misrepresented the purposes of the interview when [defendant] was invited to attend or upon [defendant's] arrival at the outset of the interview itself[;] [a]dditionally, no caselaw supports the notion that a failure to reveal fully to the accused the interrogator's specific investigative objectives vitiates

41

an otherwise valid waiver of Miranda rights or the voluntary nature of any subsequent questioning")).

For these reasons, petitioner's habeas claim regarding his December 2012 interview statements is denied.

### B.    Preindictment Delay

Petitioner also argues that the state courts unreasonably denied his due process claim based on the preindictment delay.  Pet. at 32-36.

#### 1.    Relevant Background

As discussed, after the *Singer* evidentiary hearing, the retrial court found respondent "had a good faith basis to defer the prosecution and did not do so to seek a tactical advantage against [petitioner]."  SCR 470.  In particular, the retrial court accepted respondent's explanation that the prosecution did not seek a court order to obtain a confirmatory DNA sample because it did not want to "alert[] [petitioner] that he was a suspect in the rape," such that he would "invoke his right to counsel."  *Id.* at 456.  Instead, the prosecution hoped to obtain an admission from petitioner.  *Id.*

Regarding the prejudice to petitioner, the trial court rejected petitioner's argument that the delay resulted in the deprivation of a particular alibi witness—his ex-girlfriend— because it found that she would have been hostile to petitioner regardless of the delay and also could not provide an alibi.  *Id.* at 469 (noting that petitioner had previously been convicted of sexually abusing the minor daughter of the alleged alibi witness—an ex-girlfriend—and that, as a result, the ex-girlfriend was already hostile).

The Appellate Division subsequently affirmed the trial court's conclusion that petitioner's due process rights had not been violated, and, in doing so, specifically affirmed the retrial court's findings regarding bad faith and prejudice. *Id.* at 581.

Regarding bad faith, the appellate court agreed with the trial court that:

There is no indication that the "delay was caused by any bad faith on the part of the People." Instead, the delay was largely caused by the efforts of the People and law enforcement "to acquire substantial corroborating evidence in order to prove [petitioner's] guilt beyond a reasonable doubt." Nevertheless, it is true, as [petitioner] points out, that extensive periods of delay may fairly be attributed to neglect by the People and law enforcement in the investigation. But even assuming, *arguendo*, that the second factor weighs in [petitioner's] favor, three of the five factors favor the People, and we thus conclude that the court did not err in denying that part of [petitioner's] omnibus motion seeking to dismiss the indictment on due process grounds.

*Id.* (cleaned up).

As for prejudice, the Appellate Division also agreed with the retrial court that petitioner had not shown any prejudice as a result of the delay. In support, the state appellate court reasoned:

[Petitioner] contends that the extensive delay affected his ability to locate potential alibi witnesses, thus impairing his defense. But [petitioner] did not pursue an alibi defense at trial. As noted, [petitioner] testified that he had consensual sexual intercourse with the victim at the time and place she claimed the rape took place. There were thus no potential alibi witnesses to be found. Moreover, considering that by [petitioner's] own account the sexual intercourse took place in the woods with no one else around, there were no witnesses [petitioner] could have found to corroborate his testimony that the encounter was consensual. Under the circumstances, we cannot conceive of what [petitioner] could or would have done differently had he been charged in a more timely manner.[21]

---

[21] The *Stefanovich* dissent disagreed regarding how the six-year delay impaired petitioner's ability to mount a defense. SCR 583. In particular, it found that the delay

may have impaired [petitioner's] ability to present testimony that could have supported his version of the incident, or helped establish that he was not the person who the victim alleged had attacked her at a specific time. In any event, the sheer length of the delay in prosecution, in [the dissent's] view, made it more difficult for [petitioner] to support his

43

*Id.*

Petitioner subsequently argued in his leave application to the New York Court of Appeal that the Appellate Division majority interpreted "bad faith" too narrowly. *Id.* at 589. In support, he noted the prosecution's April 14, 2009 admission that it "let[] this case slip through the cracks," and suggested that the prosecution's "inadvertence" undermined its good faith. *Id.*

Petitioner further contended that the majority overlooked important factors in determining that he was not prejudiced by the delay, including the "impact on memory." *Id.* at 589-90 (citing *Doggett v. United States,* 505 U.S. 647, 656-57 (1992) (recognizing "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify")).

Respondent opposed the leave application, again arguing that the prosecution's delay was not in bad faith. SCR 598-99. In support, it explained why petitioner's "arrest for forcible rape was not a foregone conclusion" based on the September 2006 DNA match. *Id.* Respondent contended that in obtaining another swab, the prosecution was preventing "misidentification of the [petitioner] as the perpetrator." *Id.* at 599. It further noted the necessity of an additional swab given that the victim had initially misidentified the perpetrator as a younger male. *Id.* at 600. Ultimately, respondent asserted that there was no evidence that it acted "deliberately to obtain a tactical advantage," and that to find otherwise would be penalizing prosecutorial "restraint and due diligence." *Id.* at 600-01.

---

version of events regarding the incident, which occurred in July 2005, even if he could not establish a precise way in which such impairment was manifested.

*Id.* (citations omitted).

As for prejudice, respondent argued the Appellate Division correctly determined that petitioner's contention that the delay impacted his ability to obtain alibi witnesses was undermined by his consensual intercourse defense and refuted by the DNA evidence. *Id.* at 601.

### 2.    Current Petition

#### a.    Exhaustion

Respondent contends that petitioner failed to substantively exhaust the claim, asserting that petitioner raised only a claim based on the violation of his state rights, and did not raise a federal due process claim. Oppos. at 19-20. Petitioner replies that if it is "true" that the claim is unexhausted, the Court's failure to consider the claim will result in a "fundamental miscarriage of justice' based upon new evidence discovered." Reply at 2.

The Court disagrees with respondent that the claim is not substantively exhausted, noting: (1) petitioner's initial motions before the trial court raised the preindictment delay issue as both a federal and state law issue, SCR 167 (citing *Barker v. Wingo*, 407 U.S. 514 (1972), and *Hoffa v. United States*, 385 U.S. 293 (1966)); (2) the second trial court expressly concluded that petitioner had not been deprived of due process under the federal constitution, SCR 470; and (3) petitioner's July 2022 leave application also cited United States Supreme Court law. SCR 590 (citing *Doggett,* 505 U.S. at 656-57).

The Second Circuit has held that the relevant inquiry for substantive exhaustion is whether "'the nature or presentation of the claim [was] likely to alert the court to the claim's federal nature.'" *See Ramirez v. New York*, 280 F.3d 87, 94 (2d Cir. 2001) (citation omitted). Here, even though the Appellate Division's July 2022 decision itself cited only state law in its

decision, the above shows that petitioner "fairly presented" to the state courts the pre-indictment delay claim as a federal issue as well. *See* SCR 582.

> **b.    Merits**

> > **i.    Relevant Legal Standards**

As noted, petitioner cited several United States Supreme Court cases in support of his claim. See SCR 167 (citing *Barker*, 407 U.S. at 514, and *Hoffa v. United States*, 385 U.S. at 293 process rights); SCR 590 (citing *Doggett,* 505 U.S. at 656-57). The cited cases concern a defendant's/petitioner's speedy trial rights under the Sixth Amendment and Fourteenth Amendments. *See id.*

In relying on the above federal cases, petitioner appears to miss a key difference between federal law and New York law. There is no dispute that New York law, including the *Taranovich* case applied by the state trial and appellate courts here, analyzes both pre-indictment and post-indictment delay under the same rubric—a rubric nearly identical to the test outlined by the Supreme Court in *Barker*, as cited by petitioner. *See Taranovich*, 37 N.Y.2d at 445; *cf. Barker,* 407 U.S. at 513 (noting that balancing test in assessing speedy trial cases includes consideration of "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant").

Federal law, by contrast, distinguishes between pre-indictment and post-arrest delay. *See Almonte v. Lee*, No. 13 CIV. 6187, 2015 WL 3917451, at *10 (S.D.N.Y. May 20, 2015), *report and recommendation adopted*, No. 13 CIV. 6187, 2015 WL 3932162 (S.D.N.Y. June 25, 2015). The United States Supreme Court has recognized "[t]he Sixth Amendment's guarantee of a speedy trial is applicable only *after* a person has been 'accused' of a crime[.]." *United States v. Marion*, 404 U.S. 307, 307 (1971) (emphasis added); *see also United States*

46

*v. Elsbery*, 602 F.2d 1054, 1058 (2d Cir.1979) ("It is indisputable that the Sixth Amendment speedy trial right does not apply to pre-indictment delay.") (citing *Marion*, 404 U.S. at 307, 92); *Schurman v. Leonardo*, 768 F.Supp. 993, 998 (S.D.N.Y.1991) ("Delay between the crime and the indictment is wholly irrelevant under the Speedy Trial Clause of the Sixth Amendment.") (citing *Marion*, 404 U.S. at 320).

Since the instant federal habeas petition involves only pre-indictment delay, the standards utilized by the Supreme Court in the post-arrest/speedy trial cases of *Barker, Hoffa,* and *Doggett*, as cited by petitioner, do not provide the applicable framework for petitioner's federal habeas claim.  Instead, here, petitioner's pre-indictment delay claim presents a potential due process violation (as opposed to a speedy trial violation) under the Fifth and Fourteenth Amendments. *See Marion*, 404 U.S. at 322, 324; *United States v. Lovasco*, 431 U.S. 783, 795–96 (1977); *see also Elsbery*, 602 F.2d at 1059 (rejecting petitioner's claim that pre-indictment delay violated Sixth Amendment Speedy Trial protections given that period was prior to his arrest, holding that instead the petitioner's "claim based upon pre-indictment delay must rest, therefore, upon the Due Process Clause").

The Court notes that respondent here has argued that, unlike post-arrest delay, there is no "clearly established [Supreme Court] law" regarding pre-indictment delay.  Oppos. at 23. Respondent acknowledges the Supreme Court has recognized that lengthy pre-indictment delays can implicate due process rights, but it cites to lower federal court cases in arguing that disagreement over standard interpretation and implementation means the law is not "clearly established."  *Id.* at 21.  The Court disagrees and sets forth below the relevant clearly established law, which includes the Supreme Court's decisions in *Marion* and *Lovasco.* Additionally, the Court notes that respondent's argument is undercut by AEDPA, which itself

recognizes that only Supreme Court decisions constitute clearly established federal law for habeas purposes.  *See Brown*, 596 U.S. at 136; *Parker*, 567 U.S. at 48–49.

As for "clearly established federal law," the United States Supreme Court has held that a substantial delay in bringing charges – e.g., a pre-indictment delay— presents a potential due process violation under the Fifth and Fourteenth Amendments. *See United States v. Marion*, 404 U.S. at 322, 324; *Lovasco*, 431 U.S. at 795–96; *see also Elsbery*, 602 F.2d at 1059 (rejecting petitioner's claim that pre-indictment delay violated Sixth Amendment Speedy Trial protections given that period was prior to his arrest, holding that instead the petitioner's "claim based upon pre-indictment delay must rest, therefore, upon the Due Process Clause"). "[T]o prevail on a claim of unconstitutional pre-indictment delay, a petitioner must show that he suffered actual prejudice as a result of the delay and that the delay was an intentional device to gain a tactical advantage [by the prosecution]."  *Denis v. Upstate Corr. Facility*, 361 F.3d 759, 760 (2d Cir. 2004) (citing *Marion*, 404 U.S. at 322-24) (noting that statutes of limitations are "'the primary guarantee against bringing overly stale criminal charges'"); *see also Lovasco*, 431 U.S. at 789–90.

This is a "heavy burden," which typically requires showing "a course intentionally pursued by the government for an improper purpose" by the prosecution. *United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir.1999) (emphasis omitted); *cf. Arizona v. Youngblood*, 488 U.S. 51, 57 (1988) (citing *Marion* and *Lovasco* for proposition that to establish constitutional violation derived from loss of evidence, bad faith by the prosecution must be shown).  The Second Circuit has further explained that the prejudice required is "that sort of deprivation that impairs a defendant's right to a fair trial," which "is commonly demonstrated

by the loss of documentary evidence or the unavailability of a key witness.'" *Cornielle*, 171 F.3d at 752 (citation omitted).

### ii.     Analysis

In his federal habeas petition, petitioner accurately notes that there is no statute of limitations under New York law for first degree rape.  He thus suggests that his due process right to prompt prosecution is even "more fundamental" as a result.  Pet. at 35-36.

Respondent's habeas opposition in large part repeats the arguments found in its opposition to petitioner's state court leave application, as detailed above.  In addition, it argues that petitioner has abandoned any challenge to the state court's prejudice finding—solely challenging here the absence of bad faith finding.  Oppos. at 25.  The Court notes, though, that the state appellate court addressed the prejudice issue in its latest written, reasoned decision with no finding of abandonment or procedural default.[22]  SCR 581.  Thus, the Court rejects respondent's exhaustion argument.

For the reasons below, the state appellate court reasonably affirmed the retrial court, determining that petitioner had not demonstrated bad faith on the part of the prosecution or that he was actually prejudiced by the pre-indictment delay.

### a.     Prejudice

The Appellate Division's conclusion that petitioner did not establish prejudice was not an unreasonable application of Supreme Court precedent; nor were the underlying findings unreasonable determinations of fact.

---

[22] Petitioner does not waive the argument in his federal habeas brief as much as he appears to make the erroneous argument that he is not required to show prejudice if he can show bad faith. *See* Pet. at 35.

In *Marion*, the defendants relied "solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost."  404 U.S. at 325.  Petitioner does the same here.  Relief is, however, foreclosed by the Supreme Court's holding in *Marion* that "these possibilities are not in themselves enough to demonstrate that [the defendants] cannot receive a fair trial and to therefore justify the dismissal of the indictment."  *Id.* at 325-26.

Moreover, the Second Circuit has further noted that petitioner must present proof of prejudice that is "definite and not speculative" and "must demonstrate how (the loss of evidence) is prejudicial" to him.  *United States v. Birney*, 686 F.2d 102, 105–06 (2d Cir.1982); *accord United States v. Guerra*, No. 10 CR 147, 2012 WL 1899861, at *5 (E.D.N.Y. May 24, 2012).  Here, petitioner's speculation that additional evidence could have helped his defense is far from the definite proof of prejudice required to state a due process claim.

### b.     Bad Faith

Nor has petitioner shown that the Appellate Division's related findings and overarching conclusion that petitioner failed to establish prosecutorial bad faith were unreasonable under AEDPA.

In *Lovasco*, the Supreme Court held that prosecuting a defendant following investigative delay does not constitute a deprivation of due process, even if the defendant's "defense might have been somewhat prejudiced by the lapse of time."  431 U.S. at 796.  There, the Court observed that "the only reason the [prosecution] postponed action was to await the results of additional investigation[,]" leading the Supreme Court to conclude that "compelling [the defendant] to stand trial would not be fundamentally unfair[,]" *id.* at 796, "even if his defense might have been somewhat prejudiced by the lapse of time."  *Id.*

50

In so holding, the *Lovasco* Court was reluctant to allow courts to substitute their judgment for the prosecutor's in the decision of when an indictment should issue. *Id.* at 796-97 ("Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt."). The Court reiterated that prosecutors are not under any duty to file charges as soon as probable cause exists, nor even as soon as the Government "has assembled sufficient evidence to prove guilt beyond a reasonable doubt." *Id.* at 792.

Here, the Appellate Division's conclusion that there was no bad faith was not an objectively unreasonable application of *Lovasco*. *See id.* at 796 ("[T]o prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time."). Moreover, like *Marion*, there is also no evidence that respondent intentionally delayed commencing a prosecution against petitioner. *See* 404 U.S. at 325. To the extent that petitioner suggests the prosecution's mere negligence in delaying the prosecution is sufficient for a finding of bad faith, this Court agrees with the other federal habeas courts that have recognized the Supreme Court "has never held that a due-process violation results from mere negligence." *McFadden v. Graham*, No. 1:18-CV-00865, 2019 WL 4016160, at *6 (W.D.N.Y. Aug. 25, 2019) (quoting *Oppelt v. Glebe*, 550 F. App'x 499, 500 (9th Cir. 2013)).

This claim is therefore denied on the merits.

## C.    Second Trial Court's Ruling re Admission of Petitioner's First Trial Testimony on Retrial

Petitioner also argues that he is entitled to habeas relief based on the second trial

51

court's ruling permitting respondent to introduce into its case-in-chief on retrial petitioner's testimony from his first trial.  Pet. at 19; SCR 58.

### 1.     Relevant Background

As noted, petitioner testified at his first trial that he had consensual sex with the victim in exchange for beer money.  SCR 641, 706.  In proceedings prior to retrial, petitioner suggested that he had not decided whether he would testify again at the second trial.  He moved the second trial court to preclude admission of his first trial testimony on the grounds that it was the "fruit" of his trial counsel's ineffective assistance of counsel.  *Id.* at 171.

After the parties fully briefed the issue and the second trial court held a hearing, it denied petitioner's motion, concluding that respondent was permitted to introduce into its case-in-chief petitioner's testimony from his first trial.  *Id.* at 58.  The court reasoned that state law demonstrated that petitioner's testimony should be precluded "only if illegality or misconduct on the part of the law enforcement officials or police prompted the testimony."  *Id.* at 473-74.  The trial court further rejected petitioner's argument that his testimony at the first trial was necessitated by his counsel's ineffective assistance.  *Id.* at 475.  Instead, it found that petitioner was required to testify "to overcome the direct testimony of the victim" and "the identification of the rape kit semen and buccal swab" in an effort to support the "defense theory of consensual sex."  *Id.*

On his second direct appeal, petitioner reiterated that his first trial testimony was tainted by his counsel's ineffective assistance and that it should have been suppressed.  *Id.* at 58-59 (citing *Harrison v. United States*, 392 U.S. 219, 223 (1968), in addition to several New York state cases).  He contended that, "[s]pecifically, defense counsel's ineffective choice to reveal [petitioner's] [sex offender registry] status infected the entire trial, including

[petitioner's] choice whether to testify, and as such [petitioner's] testimony should have been precluded." SCR 58-59. Petitioner suggested that he may have never testified at his first trial had his sex offender status not been revealed by his ineffective trial counsel. *Id.* at 109.

Respondent countered that petitioner failed to explain "how the pretrial ruling permitting the use of his prior testimony in the [prosecution's] case-in-chief would prejudice him." *Id.* at 87. It noted that petitioner's defense in both trials was consensual intercourse. It further suggested the issue was moot because respondent did not ultimately use petitioner's testimony in its case-in-chief. *Id.*

The Appellate Division denied the claim without citation to either state or federal law, finding simply that, even if the trial court's ruling was improper, there was no prejudice since respondent did not actually introduce petitioner's testimony in its case-in-chief. *Id.* at 579.

Subsequently, in his application for leave to appeal, petitioner argued the Appellate Division overlooked the extent to which the trial court's ruling allowing for admission of his first trial testimony influenced his decision to testify at his retrial. *Id.* at 592-93. In other words, petitioner suggested that any prejudice occurred at the time the trial court issued its ruling – regardless of whether respondent, in fact, subsequently offered his testimony in its case-in-chief. *See id.* (arguing that "[t]he threat of [respondent] utilizing [petitioner's] first trial testimony hovered over every aspect of the defense [on retrial], forcing [petitioner] down a path where his only defense was the same one utilized in a losing effort and with a defense counsel who was undeniably ineffective").

Respondent reiterated in its opposition to the leave application that the Appellate Division was correct that even if the trial court's ruling permitting introduction of the testimony was improper, there was no prejudice based on respondent's ultimate decision not to

53

introduce petitioner's first trial testimony.  *Id.* at 603.  In support, it contended there was no merit to petitioner's argument that the trial court's ruling forced him to testify on retrial.  *Id.* Respondent further suggested that, in fact, Petitioner's decision to testify came at the second trial *after* the prosecution's case-in-chief—at a time, according to respondent, when petitioner would have known that the court (bench trial) had not been presented with his prior first trial testimony.  *Id.*  As such, respondent argued that the trial court's "evidentiary ruling had no impact on [petitioner's] decision whether to testify."  *Id.*

### 2.    Instant Petition

#### a.    Additional Ineffective Assistance of Counsel Issue re First Trial Counsel's Performance

At the outset, the Court notes petitioner attempts to expand this claim regarding the second trial court's ruling on his first trial testimony to add an underlying ineffective assistance of counsel issue that was not addressed by the state courts.

Petitioner argues that his first trial counsel was ineffective not only for referencing his sex offender status—the issue addressed and exhausted in the state courts—but also because counsel failed to adequately prepare him to testify on his own behalf.  Pet. at 36-37. He raised the underlying ineffective assistance issue before the state appellate courts in his second direct appeal and his application for leave before the New York Court of Appeals. *See* SCR 109 (Petitioner's counseled brief on second direct appeal); *id.* at 593 (Petitioner's counseled leave application).  The state appellate courts did not, however, address the issue. *See id.* at 579-83.

Petitioner concedes direct appeal was the improper vehicle for raising the claim, but he nevertheless argues, on the merits, that the ineffective assistance tainted his testimony at the first trial and should have been excluded by the second trial court for that reason.  Pet. at

36-37.  Respondent agrees with petitioner that unlike the other underlying ineffective assistance claim on which the state appellate court granted relief, petitioner's ineffective assistance claim regarding his first trial counsel's failure to adequately prepare him to testify involved matters outside of the record, which he could not bring on direct appeal.  Oppos. at 31 (noting that state law required the issue to be raised in a collateral motion).  Instead, as respondent notes, the proper vehicle for petitioner's claim was a collateral proceeding under New York Criminal Procedure Law § 440.10.  *See id.* at 31 (asserting that "state[]law requires [issues based on off-the-record discussions with counsel] to be raised on collateral motion," citing New York Criminal Procedure Law § 440.10(2)(c)); *see also Fulton v. Graham*, 802 F.3d 257, 263 (2d Cir. 2015) (holding that where an ineffective assistance of counsel claim does not "appear on the face of the record," "state courts ordinarily demand that such ineffective assistance claims be brought in collateral proceedings, rather than on direct appeal") (citing *People v. Haffiz,* 19 N.Y.3d 883 (2012), *People v. Peque*, 22 N.Y.3d 168, 202 (2013)).

In opposition, respondent additionally acknowledged that petitioner "*does not appear* to have raise[d]" the issue before the state courts in a collateral motion.  Oppos. at 31 (emphasis added).

Because respondent failed to include the relevant Oswego County Court dockets in this Court's habeas record, and given the absence of definitive language from respondent as to whether petitioner sought collateral relief below, the Court sought clarity from respondent in a May 21, 2026 text order, as to whether, in fact, petitioner filed a § 440 motion with the state courts.  See Dkt. No. 26, May 2026 text order.  The Court ordered respondent to supplement the record with: (1) a statement as to whether petitioner sought collateral relief

55

before the state courts in this case, along with the state trial and appellate court docket sheets for this case; and (2) to the extent respondent discover[ed] petitioner indeed sought state court collateral relief, petitioner's and respondent's briefs in any state court collateral proceedings; all opinions, orders, and transcripts of such proceedings; and an index to the materials associated with any collateral proceedings.  *Id.*

On June 4, 2026, respondent filed with the Court a letter brief in which Assistant Attorney General Margaret Cieprisz clarified that petitioner did not file a § 440 motion, noting:

> The state courts have informed [the AG's] office that petitioner has filed no collateral motions in connection with his state court conviction.  Specifically, Deputy County Clerk Matthew Bacon, of the Oswego County Clerk's Office, reviewed all files in connection with petitioner's state court case and determined that petitioner has not filed any collateral motions in that court. [23]

Dkt. No. 29, at 1.  Respondent attached a copy of the docket from the Oswego County Clerk. *Id.* at 6-7.  That docket sheet confirms that petitioner did not file any § 440 motions.

Respondent's June 2026 letter brief explained that respondent did not previously in its opposition address the exhaustion issue that was the subject of the court's May 2026 text order because it did not interpret petitioner's habeas petition to raise an "independent" ineffective assistance of claim based on petitioner's first trial attorney's failure to prepare him to testify.[24]  Dkt. No. 29, at 2.  Respondent made several additional arguments in its June 2026 letter brief, which the Court need not and does not consider to resolve the instant

---

[23] The Court accepts respondent's statement, noting, though, that a declaration or affidavit to that effect would have been more appropriate.

[24] As noted in the Court's text order, respondent nevertheless addressed the issue on the merits in its opposition, contending there was no record support for the expanded claim before this Court, and, absent any supporting citations, that there was "nothing in the trial record or in petitioner's testimony [that] itself suggests that petitioner was ill-prepared to testify."  Oppos. at 31 (noting that the "Appellate Division made no determination that petitioner's attorney was ineffective in this regard").

claim.[25]

It is true that petitioner did not raise the issue as an "independent " ineffective assistance claim but instead as part of a claim regarding the admission of his first trial testimony.   Nevertheless, in addressing the overarching claim on the merits, the Court must consider whether petitioner exhausted the underlying basis for the claim:  his trial counsel's alleged ineffective assistance in preparing him to testify.

Petitioner's inclusion of the issue in his second direct appeal and his application for leave did not render the issue exhausted.  As noted, in New York State, "[c]laims for ineffective assistance of counsel based on evidence outside the trial record should be raised in a collateral motion to vacate the judgment pursuant to New York Criminal Procedural Law § 440.10."  *Acosta v. Couture*, No. 99 Civ. 9727, 2003 WL 272052 at *6 (S.D.N.Y. Jan. 23, 2003); *see also Oppenheimer v. Kelly*, No. 97 Civ. 3035, 1999 WL 435159 at *2 (S.D.N.Y. June 24, 1999) ("Under New York law, a defendant who questions his counsel's effectiveness should do so first through a collateral or post-conviction motion to vacate judgment brought pursuant to . . . § 440.10(1)(h).").  A § 440.10 motion permits "evidentiary exploration of matters both on and off the record, and [is] the preferred avenue for inadequate representation claims in New York." *Caballero v. Keane*, 42 F.3d 738, 740 (2d Cir.1994). Therefore, if an ineffective assistance of counsel claim based on matters outside the record is only raised on direct appeal and not in a § 440.10 motion, the "claim is deemed unexhausted [for purposes of habeas review] because it was not properly raised in the state court. . . ." *Acosta*, 2003 WL 272052 at *6.

---

[25]Because the Court finds respondent's additional arguments unnecessary to its resolution, and because the Court has not considered those additional arguments, it has not ordered further briefing from Petitioner.

However, because petitioner here is no longer able to seek collateral relief via a § 440.10 motion in state court, the claim is nevertheless "'deemed' exhausted." *Adsit*, 2018 WL 1175090, at *7 (citing *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994)); *see also Aparicio*, 269 F.3d at 90 (citing *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir. 1997) ("When a claim has never been presented to a state court, a federal court may theoretically find that there is an 'absence of available State corrective process' under § 2254(b)(1)(B)(i) if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile.")).  Significantly, though, the claim remains procedurally defaulted.  *Adsit*, 2018 WL 1175090, at *7 (citing *Bossett*, 41 F.3d at 828).

Accordingly, because it is procedurally defaulted, the claim is unreviewable unless petitioner can show cause for the default and actual resulting prejudice, or show cause that the denial of habeas relief would result in a fundamental miscarriage of justice, "i.e., that he is actually innocent of the crime for which he has been convicted." *Dunham*, 313 F.3d at 730 (citing *Schlup*, 513 U.S. at 321); *see also House*, 547 U.S. at 536–39.

Here, although Petitioner acknowledged that he was unable to raise the claim on direct appeal, he failed to identify any cause for his default—e.g., his failure to raise the issue in a § 440.10 motion.  Pet. at 37.  Moreover, the conclusory allegation in his reply that the Court's failure to consider the claim would "result in a 'fundamental miscarriage of justice' based on new evidence discovered" does not suffice to show that "more likely than not. . .  no reasonable juror would find [petitioner] guilty beyond a reasonable doubt." *Rivas,* 687 F.3d at 541 (quoting *House*, 547 U.S. at 538).

Accordingly, there is nothing to save petitioner's procedurally defaulted claim that his due process rights were violated when counsel's ineffective assistance in preparing him for

58

his first trial testimony unconstitutionally tainted his trial testimony, which the retrial court ruled admissible at his second trial.

### b.    Merits of Exhausted Claim re Admission of Testimony

### i.    Parties' Federal Habeas Arguments

Petitioner repeats the arguments made in his state court leave application, suggesting that clearly established federal law required the trial court to exclude his prior testimony given its connection to the ineffective assistance of counsel.  Pet. at 38.

In opposition, respondent argues that the Supreme Court's decision in *Harrison*, 392 U.S. at 220, relied on by petitioner, did not establish an exception applicable here to the "general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings."  Oppos. at 28; *Harrison*, 392 U.S. at 222.  In support, respondent relies on lower federal court cases, which it contends demonstrate the limitations to the exception as articulated by *Harrison.*  Oppos. at 29.

Alternatively, respondent argues that even if the *Harrison* exception applies to the "fruits" of a counsel's ineffective assistance, petitioner's prior testimony here did not constitute "the 'fruit' of his attorney's ineffective assistance."  Oppos. at 30.  In support, it notes that the Appellate Division itself acknowledged on petitioner's first direct appeal that "petitioner's attorney informed the [first trial] court before voir dire that petitioner would be testifying at trial."  *Id.* at 30 (citing SCR 717-18).  Respondent thus argues that petitioner's decision to testify was made at the start of his first trial and prior to any ineffective assistance by his first trial attorney.  *Id.*  Furthermore, respondent argues that petitioner testified at his first trial not because of his trial counsel's violative disclosure of his status as a sex offender but because he was required to argue a consent defense given the DNA evidence identifying him as the

source of the semen.  *Id.* at 32 (asserting that consent would not have been a "viable defense" if petitioner had not offered his testimony explaining an alternative reason why his DNA was present).

Finally, respondent argues that even if petitioner's testimony could be deemed a "fruit" of trial counsel's ineffective assistance such that the trial court erred, any error was harmless because petitioner's testimony was not admitted by the prosecution at the second trial.  *Id.* at 31.

### ii.    Analysis

It is well-settled that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.1983); *see generally Estelle*, 502 U.S. at 67 ("[F]ederal habeas corpus relief does not lie for errors of state law.") (citations omitted).  Instead, for a habeas petitioner to prevail in connection with a claim regarding an evidentiary error, the petitioner must demonstrate that the error deprived him of his right to "a fundamentally fair trial."  *Taylor*, 708 F.2d at 891; *accord Zarvela v. Artuz*, 364 F.3d 415, 418 (2d Cir. 2004).

Framed properly to state a federal habeas claim, the issue here is whether the Appellate Division unreasonably applied clearly established Supreme Court law and/or unreasonably determined that petitioner's first trial testimony was not unconstitutionally tainted by his counsel's ineffective assistance such that it required suppression.  *See* SCR 58 (citing *Harrison*, 392 U.S. at 223).

a.    **The State Court's Decision Was Not Contrary to or an Unreasonable Application of Clearly Established Supreme Court Law.**

In the sole Supreme Court decision relied on by petitioner, the *Harrison* Court held that a defendant's testimony from a prior trial was not admissible on retrial where the prior testimony constituted the "fruit of the poisonous tree."  392 U.S. at 220, 222. In support, it reasoned that the *Harrison* defendant's testimony was induced by the prosecution's "illegal" introduction to the jury of the defendant's prior confessions that had themselves been "illegally obtained and [were] therefore inadmissible."  *Id.*

The prosecution in *Harrison* introduced in its case-in-chief three of the defendant's prior confessions regarding a felony murder charge.  *Id.* at 220.  Petitioner subsequently took the stand and testified to a version of events that differed from the admitted confessions.  *Id.* at 221.  The appellate court reversed and remanded, concluding that the confessions were illegally obtained and inadmissible.  *Id.* at 220.  On remand and retrial, over the defendant's objection, the prosecution "read to the jury the petitioner's testimony at the prior trial— testimony which placed the petitioner, shotgun in hand, at the scene of the killing."  *Id.*  at 221.  The jury convicted, and the *Harrison* Court ultimately reversed the conviction.  *Id.* at 221, 226.

In reversing the defendant's conviction, the *Harrison* Court acknowledged "the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings."  *Id.* at 222 (noting that "[a] defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful

61

evidence adduced against him").  However, the Court held that the case presented an exception to the general admissibility rule, reasoning that "[h]aving 'released the spring' by using the petitioner's unlawfully obtained confessions against him, the Government [was required] to show that its illegal action did not induce [the petitioner's] testimony."  *Id.* at 225 The Court noted that it was "of course, difficult to unravel" the precise reason(s) the *Harrison* petitioner testified at his first trial.  *Id.*  Ultimately, though, the Court held that it could not find "that the petitioner's testimony was obtained 'by means sufficiently distinguishable' from the primary illegality [to have been] purged of the primary taint.'"  *Id.* at 226 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)).

Respondent argues here that *Harrison* should be narrowly construed, and that there is no clearly established Supreme Court law that establishes an exception to the general evidentiary rule on retrial for testimony resulting from the taint of ineffective assistance of counsel.  Oppos. at 29 (citing *Harrison*, 392 U.S. at 223 n.9 (majority notes that contrary to the dissenting opinion's suggestion otherwise, it "decide[s] here only a case in which the prosecution illegally introduced the defendant's confession in evidence against him at trial in its case-in-chief")).  Petitioner counters that to construe *Harrison* as precluding admission of a defendant's prior trial testimony at retrial only in the case of the prosecution's misconduct is too narrow –and that preclusion under *Harrison* should also apply where, like here, the testimony has been tainted by ineffective assistance.  Pet. at 38.

Lower federal courts and state courts disagree regarding the scope of the *Harrison* exception.  Respondent cites to decisions in which the lower courts and/or state courts refused to extend *Harrison* to prior testimony that was inadmissible for reasons unrelated to prosecutorial misconduct.  Oppos. at 29; *see, e.g., United States v. Bohle*, 475 F.2d 872, 876

(2d Cir. 1973) (declining to extend *Harrison's* "fruits" exception to prior testimony "'impelled' by mere evidentiary hearsay error").  However, other lower federal courts and state courts have, by contrast, held that "the logic of *Harrison* may be expanded to instances where ineffective assistance of counsel *directly* results in the criminal defendant's testimony." *United States v. Pyron*, No. 201900296R, 2022 WL 2764366, at *6 n.56 (N-M. Ct. Crim. App. July 15, 2022), *aff'd*, 83 M.J. 59 (C.A.A.F. 2023) (emphasis added) (citing *United States v. Murray*, 52 M.J. 671, 675 (N-M. Ct. Crim. App. 2000) (prior trial testimony was inadmissible at retrial under *Harrison* where trial counsel committed ineffective assistance when he adopted a defense strategy that did not contest the charged rape occurred but instead offered defendant's "sleep deprivation" as a defense); *see also Rolon v. State*, 72 So.3d 238, 245 (Fla. Dist. Ct. App. 2011) (holding that "a defendant's testimony given in violation of his Sixth Amendment right to counsel may not generally be used against him in a subsequent proceeding. . . when counsel's ineffectiveness directly affects the defendant's testimony and thereby taints the entire trial").

There is no dispute that, here, unlike *Harrison*, it was *not* the prosecution but petitioner's own trial counsel who "released the spring" by ineffectively referring to petitioner's status as sex offender before the jury during his first trial.  *See* 392 U.S. at 225. Understandably, petitioner would nevertheless like this Court to apply *Harrison*'s exception to his prior testimony, which he contends resulted from trial counsel's ineffective assistance. However, it is not the role of this federal habeas court to clarify and extend the *Harrison* decision to the circumstances here.

As another federal habeas court aptly noted in a similar case, *Harrison* "did not deal with the fact pattern at issue–where a defendant testifies on the basis of his attorney's advice

63

and a court later determines that counsel was ineffective for presenting prejudicial evidence through Petitioner's testimony (and for discussing prejudicial evidence in opening statements)." *United States ex rel. Morris v. Hardy*, No. 10 C 1957, 2011 WL 3420498, at *13 (N.D. Ill. Aug. 4, 2011) (concluding that petitioner was not prejudiced by introduction of a redacted version of his first trial testimony on retrial where petitioner's first trial counsel ineffectively elicited evidence of petitioner's involvement in an unrelated crime at the first trial)**.**

"A legal principle is 'clearly established' within the meaning of [AEDPA] only when it is embodied in a holding of [the United States Supreme] Court." *Thaler v. Haynes*, 559 U.S. 43, 47 (2010) (citing *Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Williams*, 529 U.S. at 412). "It is not enough that a Supreme Court holding be in the same ballpark." *Morris*, 2011 WL 3420498 at 12. Because the instant case is merely "in the . . . ballpark" of *Harrison* but not on all fours, habeas relief is not warranted. *See id.*

Furthermore, regardless of *Harrison*'s applicability, clearly established Supreme Court law provides that the proper remedy for ineffective assistance of counsel "is one that as much as possible restores the defendant to the circumstances that would have existed had there been no constitutional error." *United States v. Carmichael*, 216 F.3d 224, 227 (2d Cir. 2000) (citing *United States v. Morrison*, 449 U.S. 361, 365 (1981) ("Our approach has . . . been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel. . . .")). Here, the relief implemented by the state courts already put petitioner back in the position he would have been in had the established ineffective assistance violation not occurred: he received a new trial at which the record was redacted to restrict mention of his sex offender status.

> **b.    The State Courts did not Unreasonably Determine that Petitioner's First Trial Testimony was not a "Fruit" of his Counsel's Ineffective Assistance**

Alternatively, even if the *Harrison* exception could be interpreted to apply to testimony obtained by reason of counsel's ineffective assistance, here, habeas relief remains unwarranted because the state trial court's factual determination that petitioner's testimony at his first trial did *not* result from the ineffective assistance was not unreasonable.[26]

Like *Harrison*, this Court notes generally the difficulty in "unravel[ing]" the precise reason(s) petitioner testified at his first trial.  392 U.S. at 225.  Here, though, unlike *Harrison,* the Court finds that petitioner's testimony "was obtained 'by means [or reasons] sufficiently distinguishable' from the primary illegality[:] [the ineffective assistance of counsel]."  *Id.* at 226.  In particular, the Court agrees with the state trial court, which found that petitioner's testimony was necessitated *not* by the ineffective assistance, but by petitioner's need "to overcome the direct testimony of the victim" and "the [unfavorable DNA results] of the rape kit semen and buccal swab," in an effort to support the "defense theory of consensual sex."  SCR 475*; see also Morris*, 2011 WL 3420498, at \*13-14 (noting in similar habeas case that even if *Harrison* applied to testimony obtained via ineffective assistance of counsel, relief was nevertheless "foreclose[d]" where the "record reflect[ed] that part of the [defense] strategy in the first trial was for [the *Morris*] Petitioner to take the stand in an effort to mitigate other evidence of his involvement in the [charged crime]").  Here, because petitioner has not presented compelling evidence otherwise, habeas relief is denied under section 2254(d)(2).

> **c.    In Any Event, the Appellate Division's Determination that the Second Trial Court's**

---

[26] The Appellate Division did not address the issue, but, as noted, instead resolved the claim on prejudice grounds.  *See* SCR 579.

**Ruling did not Result in Prejudice was not
Unreasonable; nor was there Actual Prejudice.**

Finally, even if the Court were to find the trial court's ruling was erroneous and violated petitioner's due process rights under *Harrison*, habeas relief is not warranted because petitioner has not shown the requisite prejudice under either AEDPA's deferential test or *Brecht*'s actual prejudice test. *See Brown*, 596 U.S. at 136 ("AEDPA asks whether every fairminded jurist would agree that an error was prejudicial;" whereas, the second test under "*Brecht* asks only whether a federal habeas court itself harbors grave doubt about the petitioner's verdict."). In assessing both tests, the Court must consider "the overall strength of the prosecution's case." *Wood v. Ercole*, 644 F.3d 83, 94 (2d Cir. 2011) (applying *Brecht* test); *Spencer*, 788 F. App'x at 23 (applying AEDPA harmlessness test). For the reasons below, petitioner is unable to satisfy either test.

### *AEDPA Prejudice Analysis*

As noted, the Appellate Division found that since respondent did not actually introduce petitioner's first trial testimony on retrial – as permitted by the second trial court's ruling— there was no prejudice. SCR 579. While the Court agrees with the Appellate Division's ultimate prejudice conclusion, it agrees for reasons other than the one provided by the state appellate court. *See Gutierrez v. McGinnis*, 389 F.3d 300, 306 (2d Cir. 2004) ("[W]hen a state court explicitly conducts harmless error review of a constitutional error, a habeas court must evaluate whether the state unreasonably applied [the harmless error test]"); *see also Calaff v. Capra*, 714 F. App'x 47, 51 (2d Cir. 2017) (citing *Helvering v. Gowran*, 302 U.S. 238, 245 (1937) ("In the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.")).

66

The Appellate Division construed its prejudice inquiry too narrowly when it considered solely whether the contested evidence—petitioner's first trial testimony— was ultimately admitted.  *See* SCR 579 (concluding that petitioner was not prejudiced because the prosecution "did not ultimately seek to admit [his] testimony from the first trial against him at the retrial").  This narrow focus ignored the potential impact that the ruling itself had on other aspects of the retrial and petitioner's retrial strategy.  *See id.* at 592-93.  Nevertheless, the appellate court's overarching prejudice determination was not unreasonable given the "abundant evidence indicating [petitioner's] guilt."  *Spencer*, 788 F. App'x at 23 (reversing district court's decision on habeas holding that state trial court's exclusion of petitioner's testimony was prejudicial) (citing *Orlando v. Nassau Cty. Dist. Attorney's Off.*, 915 F.3d 113, 127 (2d Cir. 2019) (where "a state court makes a harmless error determination on direct appeal," the Court "owe[s] the harmlessness determination itself deference under the [AEDPA]")).

Here, the State possessed DNA from a vaginal swab for which petitioner was a near "perfect match."  RT, Dkt. No. 19-3, at 135-36 (evidence that the probability the DNA was from someone other than petitioner was less than one in three hundred billion); *see also* RT, Dkt. No. 19-4, at 80 (closing argument).  Moreover, the victim's testimony, along with additional evidence that included an emergency room physician's testimony, demonstrated that force was used.  *Id.* at 81-83.  In particular, the evidence suggested that the victim's assailant came from behind, grabbed her by the neck, and dragged her to the ground.  *Id.* The evidence also showed the victim had grass stains on her knees and suffered injuries to her neck, torso, legs, and arms consistent with being thrown to the ground and dragged.  *Id.*

Accordingly, the Court is unable to say that the Appellate Division's prejudice determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103 ("[A] state-court decision is not unreasonable if 'fairminded jurists could disagree on its correctness.'").

### *Brecht Prejudice Analysis*

Second, for the same reasons as those above, the Court does not itself harbor concerns that the trial court's ruling on petitioner's first trial testimony resulted in a "substantial and injurious effect or influence in securing the defendant's conviction." *Brecht*, 507 U.S. at 623; *Davis v. Ayala*, 576 U.S. at 268 (noting that the *Brecht* standard reflects the view that a 'State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error.'"); *Perkins v. Herbert*, 596 F.3d 161, 175 (2d Cir. 2010). Again, for the reasons above, petitioner has not demonstrated how the trial court's ruling detracted from the other strong DNA evidence against petitioner, the victim's testimony, and additional testimony and evidence regarding the injuries sustained by the victim. *See Gumbs,* 2024 WL 4707218, at *1; *Burton v. Wolcott*, No. 9:21-CV-0736 (DNH/TWD), 2024 WL 3184658, at *16–17 (N.D.N.Y. May 29, 2024), *report and recommendation adopted*, No. 9:21-CV-736 (DNH/TWD), 2024 WL 3183183 (N.D.N.Y. June 26, 2024).

For these reasons, the Court denies habeas relief on this claim.

**D.    Legal Sufficiency and Weight of Evidence Claims**

Petitioner also argues that his conviction was not supported by legally sufficient evidence and was contrary to the weight of the evidence.  Pet. at 38-40.

### 1.    Relevant Background

As noted, petitioner filed a motion to dismiss the indictment as legally insufficient and contrary to the weight of the evidence before the first trial court, which the court denied.  SCR 609-10.  Subsequently, petitioner raised the issues in both his 2015 and 2021-2022 first and second direct appeals, respectively, before the Appellate Division, and in his July 2022 application for leave to appeal to the New York Court of Appeals.  *See id.* at 2-3, 594-96, 619-20.

In petitioner's first direct appeal, citing *People v. Hines,* 97 N.Y.2d 56, 61 (2001), the Appellate Division found the claims procedurally defaulted, but nevertheless reached the merits, holding:

> Viewing the evidence in the light most favorable to the People, as we must [,] we conclude that there is a valid line of reasoning and permissible inferences that could lead a rational person to the conclusion reached by the jury based on the evidence at trial, i.e., that [petitioner] had sexual intercourse with the victim by forcible compulsion. Viewing the evidence in light of the elements of the crime as charged to the jury we further conclude that the verdict is not against the weight of the evidence. Even assuming, *arguendo*, that a different verdict would not have been unreasonable, we cannot conclude that the jury failed to give the evidence the weight it should be accorded.

SCR 720 (cleaned up).

Subsequently, following retrial, in his second direct appeal and his state court leave application, petitioner again contended that the evidence that he had nonconsensual, forcible sex with the victim was legally insufficient.  *Id.* at 62-65, 594-96.  In support, he argued that the victim's testimony was not credible because she gave a prior statement soon after the rape acknowledging she had seen two "teenagers" nearby around the time that she was

raped.  *Id.* at 63, 594.  Petitioner also emphasized that the victim initially identified two other people in a photo array after the rape, but it was later determined that those individuals' DNA was not present in the victim's rape kit.  *Id.* at 64.

Petitioner argued that the victim identified him only after the prosecution inadvertently displayed his photograph to her.  *Id.* at 64, 594.  He also contended that the victim was not credible due to her intoxication at the time of the incident.  *Id.* at 63-64, 595.

Petitioner further argued that his December 2012 interview statements and his trial testimony, while inconsistent, were reasonable, and any lapses in his memory could be explained by the passage of time related to the delayed prosecution.  *Id.* at 64-65, 595.  According to petitioner, the sexual encounter with the victim "involved prostitution" and occurred after he and the victim drank beer together.  *Id.* at 64-65, 595.  He additionally argued that evidence regarding the victim's injuries did not indicate rape or violence—but instead simply demonstrated sex in a wooded area.  *Id.* at 64, 595.

Respondent noted for the state appellate courts that petitioner conceded that the evidence was sufficient to establish sexual contact between him and the victim.  *Id.* at 89.  Accordingly, the only issue was whether the admitted intercourse occurred by forcible compulsion.  *Id.*  Respondent asserted that the victim's testimony, law enforcement observations, photographic evidence of the victim's injuries, and testimony from the emergency room physician who treated the victim after the rape was sufficient to establish forcible compulsion.  *Id.* at 89-90.

Respondent countered that the victim's credibility was not undermined by her initial account that she was raped by a "teenager" or by her initial misidentification of two young men from a photo array.  *Id.* at 604.  In support, respondent noted evidence that the victim

70

had been "attacked from behind, which prevented her from clearly seeing her assailant." *Id.*

Additionally, it noted the rape occurred at dusk when it would have been difficult to see in the

woods, and that the victim consistently testified at both trials that she did not see her rapist.

*Id.* at 604-05.  Respondent argued that it was "reasonable for the court to conclude that [the

victim's] initial identification, however, mistaken, was the product of her honest attempt to

assist the police."  *Id.* at 605.  Finally, Respondent countered that petitioner's argument

regarding the victim's intoxication was unsupported by the evidence, noting that the

responding officer and emergency room physician "testified that [the victim] did not appear to

be intoxicated."  *Id.* at 605.

In July 2022, the Appellate Division denied both claims on the merits in petitioner's

second direct appeal.  *Id.* at 580.  As for legal sufficiency, the state appellate court found that

"the evidence at the retrial was largely the same as the evidence at the first trial," and it

determined that "a rational person. . . [could have concluded] based on the evidence at trial,

i.e., that defendant had sexual intercourse with the victim by forcible compulsion."  *Id.*

The Appellate Division further held that the verdict also was "not against the weight of

the evidence."  In support, it reasoned:

> There was no dispute that, as the DNA evidence established, [petitioner] had
> sexual intercourse with the victim; the only question at trial was whether it was by
> forcible compulsion, as the victim testified, or whether it was consensual, as
> [petitioner] testified. The court evidently believed the victim and not [petitioner],
> and there is no basis in the record for us to disturb the court's credibility
> determinations, which are entitled to great deference. . ., especially considering
> [petitioner], when questioned by the police, denied having sex with the victim.

*Id.* (internal citations omitted).

The New York Court of Appeal subsequently denied petitioner's 2022 leave

application.

71

### 2.    Instant Petition

#### a.    Weight of the Evidence Claim

Respondent is correct that to the extent petitioner's claim concerns the weight of the evidence, such claims are not cognizable on federal habeas review.  *See McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) (noting that an "argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus"). "Unlike a sufficiency of the evidence claim, which is based upon federal due process principles, a weight of the evidence claim is an error of state law, for which habeas review is not available." *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (citation and internal quotation marks omitted) (noting that "[a] weight of the evidence argument is a pure state law claim grounded in [New York Criminal Procedure law ("CPL")] § 470.15(5) which empowers New York state intermediate appellate court[s] to make weight of the evidence determinations"); *accord Wright*, 2021 WL 5095292, at *6.

#### b.    Sufficiency of the Evidence Claim

 Petitioner's habeas petition repeats the arguments that he made before the state appellate courts, as detailed above.  Pet. at 38-41.  Additionally, petitioner suggests that although he acknowledged having consensual sex with the victim, a different male could have been responsible for the rape.  *Id.* at 39-40.

In opposition, Respondent notes the doubly deferential standard that applies to legal sufficiency claims in federal habeas cases and argues that the Appellate Division's decision was correct.  Oppos. at 33 (citing *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam)).  It restates many of its state appellate court arguments regarding the evidence,

noting as well that the victim "testified that she did not consent to have sexual intercourse with her assailant[,] and that her assailant was the only person with whom she had had sexual contact that day." *Id.* at 34 (citing "V.178-183, 193, 197-98").[27]

Respondent characterizes petitioner's arguments regarding the victim's initial police statements in 2005, her initial identifications, and her alleged intoxication as credibility issues that were matters for the factfinder. Oppos. at 35 (citing *Taylor,* 708 F.2d at 892)*.* It further notes that petitioner's DNA was the only DNA on the vaginal swab, and that the trial court was entitled to credit the victim's testimony that the rape was the only sexual intercourse she had that day. *Id.* at 36 (citing *Skinner v. Duncan*, 2003 21822437 at *4 (E.D.N.Y. July 17, 2003)). Respondent additionally notes that petitioner's remaining arguments concern evidence petitioner claims was improperly excluded by the trial court—which, according to petitioner, would have undermined the sufficiency of the evidence. *Id.* at 37 (noting that "[a] legal sufficiency claim addresses whether the admitted evidence meets

---

[27] The above multiple RT citations ("V. 178-183, 193, 197-98") are not to the record as it appears before this Court. In fact, throughout respondent's brief and other filings in this federal habeas case, the Court notes that respondent's cite form is "borrowed" from its state court briefs and filings. As such, respondent's citations to the voluminous reporters transcripts correspond *not* with this Court's ECF docket number(s) and sub-numbers and pages, but to the record and reporters transcripts as they were filed with the state courts. Because the two filing systems—state and federal—differ, respondent's state court citations hinder this Court's meaningful review. This is especially so given that as filed by respondent, the RT in this federal habeas case includes multiple ECF documents. *See* Dkt. Nos. 19-1 through 19-4.

However, upon a not insignificant review, the Court was able to ascertain the correct federal habeas record citations that correspond with the above state court citations provided by respondent in its brief as follows: RT, Dkt. No. 19-2 at 55-60, 70, 74-75.

Respondent is thus advised that in future briefs and related filings, it should cite to and identify pertinent portions of the record transcripts *as they are filed with the federal habeas court. E.g.,* Dkt. Nos. 19-1 through 19-4 (RT).

the elements of the offense, not whether the trial court improperly precluded evidence"). Respondent is correct, though, that such claims are not cognizable on federal habeas review. *See Taylor*, 708 F.2d at 891 (holding that "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus").

Here, drawing every reasonable inference in the prosecution's favor, the record establishes that a rational trier of fact could find evidence sufficient to satisfy forcible compulsion by physical force. *See Parker*, 567 U.S. at 43 (quoting *Jackson*, 443 U.S. at 31) (holding that evidence is sufficient to support a conviction when, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). The requisite inquiry "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original).

The Supreme Court has explained that its decision in *Jackson* "unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (quoting *Jackson*, 443 U.S. at 326). As a result, "[a] habeas court will not grant relief on a sufficiency claim unless the record is 'so totally devoid of evidentiary support that a due process issue is raised.'" *Carillo v. Superintendent of Green Have Correctional Facility,* 2024 WL 3637962, at *10 (E.D.N.Y. Aug. 2, 2024) (quoting *Sanford v. Burge,* 334 F. Supp. 2d 289, 303 (E.D.N.Y. 2004)).

74

The Court here looks to New York law in assessing the sufficiency of the evidence. *See Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("When considering the sufficiency of the evidence of a state conviction, a federal court must look to state law to determine the elements of the crime."). Here, to establish petitioner's guilt on first degree rape, the retrial court had to find beyond a reasonable doubt that petitioner engaged in sexual intercourse with the victim by forcible compulsion. *See* N.Y. Penal Law § 130.35.

> According to New York law,
>
> [w]ithin the context of sex offenses, forcible compulsion means to compel by either use of physical force; or a threat, express or implied, which places the victim in fear of immediate death or physical injury[.] Proof of forcible compulsion also satisfies the lack of consent element included not just in first-degree rape but in every offense defined under Penal Law article 130[.]

*People v. Osman*, 228 A.D.3d 1007, 1008 (3rd Dep't 2024) (cleaned up). New York courts have emphasized that "forcible compulsion is not synonymous with violence . . . and for a sex offense to be predicated upon forcible compulsion neither physical injury nor screaming or crying out is required." *People v. Hartle*, 159 A.D.3d 1149, 1152 (3rd Dep't 2018) (internal quotation marks and citations omitted).

Given the conclusive DNA evidence, the victim's testimony, and petitioner's testimony admitting to sexual intercourse, the Appellate Division's determination that "there was no dispute" petitioner engaged in sexual intercourse with the victim was "rational" and did not constitute an unreasonable determination of fact. SCR 580; *see also Herrera*, 506 U.S. at 402.

Additionally, the Appellate Division's affirmance of the trial court's finding of forcible compulsion did not constitute an unreasonable application of Supreme Court law or an unreasonable determination of fact. Here, the victim's testimony, along with additional

75

evidence that included a physician's testimony, demonstrated that force was used.  SCR 81-83; *see People v. Bailey,* 133 A.D.2d 462, 462-63 (2d Dep't. 1987) (holding that " testimony of the complainant regarding the circumstances of the joint attack upon her, together with the medical testimony regarding the bruises discovered" established the sufficiency of the evidence to prove defendant's guilt of rape and sodomy).  As noted, the evidence in this case suggested that the victim's assailant came from behind, grabbed her neck, and dragged her to the ground.  SCR 81-83.  The evidence also showed the victim had grass stains on her knees and suffered injuries to her neck, torso, legs, and arms consistent with being thrown to the ground and dragged.  *Id.*

The determination as to the victim's credibility, including the resolution of any "sharp conflict[s]" between the victim's and petitioner's testimony, were for the factfinder—here, the retrial court.  *See People v. Porrata*, 119 A.D.2d 704, 704-05 (2d Dep't 1986) ("Although the testimony of the complainant and the defendant was in sharp conflict on the issue of forcible compulsion, the witnesses' credibility was for the jury to determine and it cannot be said as a matter of law that the evidence, when viewed in the light most favorable to the prosecution, was legally insufficient.") (citation omitted).  To the extent petitioner claims that certain testimony was not credible. . . such claim[] [is] not cognizable on habeas review." *La Touche v. Graham*, No. 10 CV 1388 VB, 2013 WL 5323499, at *21 (S.D.N.Y. Sept. 23, 2013) (citing *Taylor*, 708 F.2d at 892 (noting that, on habeas review, court is "not free to second-guess . . . credibility judgments")); *see also Peterson v. Greene*, 2008 WL 2464273, at *6 (S.D.N.Y. June 18, 2008) ("[Q]uestions of credibility are quintessentially matters for the jury, and do not raise constitutional issues of sufficiency for resolution by a habeas court.")

For the above reasons, these habeas claims also fail.

**VI.     CONCLUSION**

**WHEREFORE**, it is

**ORDERED** that the petition, Dkt. No. 1, is **DISMISSED AND DENIED**;

**ORDERED** that the Court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)).  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.  *See* Fed. R. App. P. 22(b); 2d Cir. R. 22.1.

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: July 8, 2026

_____
Elizabeth C. Coombe
U.S. District Judge